1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SALVADOR A. RODRIGUEZ,

        Petitioner,

    v.

DERRAL ADAMS, Warden,

        Respondent.

_____/

No. C 04-2233 PJH

**ORDER GRANTING PETITION
FOR WRIT OF HABEAS
CORPUS**

     Before the court is the petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, filed by state prisoner, Salvador Rodriguez ("Rodriguez").  Having reviewed the parties' papers, and having carefully considered their arguments, the record, and the relevant legal authorities, the court hereby GRANTS the petition.

## BACKGROUND

     On July 8, 1998, Rodriguez was charged with murder under California Penal Code § 187, along with enhancements that during the commission of the murder, he intentionally discharged a firearm and proximately caused death under California Penal Code § 12022.53(d); that he used a firearm under California Penal Code §§ 1203.06 and 12022.5; and that he inflicted great bodily injury under California Penal Code § 1203.075.

     On January 20, 2000, an Alameda County Superior Court jury convicted Rodriguez of second degree murder with the use of a firearm to proximately cause death, but found the allegation of infliction of great bodily injury to be untrue. The trial court sentenced Rodriguez to state prison for a term of 40 years to life.

**United States District Court**
For the Northern District of California

1    Rodriguez unsuccessfully appealed his conviction to the California Court of Appeal,

2    and the California Supreme Court denied review on February 13, 2002.

3    Rodriguez subsequently filed a state habeas petition with the Alameda County

4    Superior Court, which the court denied.  He then filed a habeas petition with the California

5    Court of Appeal, and that court issued a postcard denial.  On February 4, 2004, the

6    California Supreme Court also summarily denied Rodriguez's petition for state habeas

7    relief.

8    Rodriguez then filed a petition for federal habeas relief with this court on

9    June 7, 2004.

10   **A.    Factual Background**

11   On the evening of March 3, 1998, in Oakland, California, Rodriguez shot and killed

12   Frederick Walker ("Walker").  Prior to the shooting, a group of neighborhood youths

13   including Roy Ramsey, Vonree Alberty, Kenneth Jackson, Thurston Breshell, Marcus

14   Hawkins, and Albert Bagwell (referred to collectively as the "Melrose group") were hanging

15   out in and around a car (the "Jackson-Alberty car") on the 4700 block of Melrose Avenue,

16   also the block on which Rodriguez lived, near Hawkins' house.  Shortly before 6:00 p.m., a

17   station wagon with approximately nine or ten African-American teenagers[1] (the "Walker

18   group" or "Walker car") drove down Melrose Avenue, from 47th to 48th Avenues and made

19   a u-turn on 48th Avenue.  The teenagers in the Walker group were not from the

20   neighborhood.  Among others, the Walker group included the driver, Damon Brown;

21   Brown's cousin, Ferrari Johnson; the victim, Frederick Walker; and the victim's brother,

22   David Walker.

23   The Walker station wagon first parked near a stop sign on 48th Avenue.  The

24   occupants of the Walker car then exited the vehicle and approached the Melrose group.

25   After the Walker group converged on the Melrose group, the groups then split.  Ramsey, a

26   _____

27   [1]Witnesses gave varying numbers, and it was never established exactly how many
28   people comprised the Walker group.

2

United States District Court
For the Northern District of California

1  member of the Melrose group, walked down the street and was subsequently surrounded

2  by members of the Walker group.  Breshell, Alberty, and Jackson, other members of the

3  Melrose group, remained in or around the Jackson-Alberty car and were also approached

4  by members of the Walker group.

5       The timing of the subsequent events is a bit unclear.  Members of the Walker group

6  "relieved" Ramsey of three dime bags of marijuana.[2]  Around the same time, a member of

7  the Walker group went back to their station wagon, and pulled it alongside, apparently

8  double-parking next to the Jackson-Alberty car.  Two members of the Walker group then

9  began hassling Breshell.

10      After the Walker group took the marijuana from Ramsey, Ramsey walked across the

11  street to Rodriguez's house, and went up to Rodriguez, who had exited his house after

12  hearing loud noises.  Ramsey told Rodriguez that he had just been robbed by the Walker

13  group.  At this point, Rodriguez observed a tussle between Breshell and members of the

14  Walker group.  Ramsey subsequently gave Rodriguez a gun, and Rodriguez then shot up

15  in the air several times in an attempt to scare away the Walker group.  One of these shots

16  hit the victim, Walker, in the head and killed him.

17  **B.    Trial Proceedings**

18          **1.     Prosecution Key Witnesses**

19                  **a.     Jewel Marshall**

20      The prosecution called Jewel Marshall, a neighbor of Rodriguez's who lived on

21  Melrose Avenue.  Marshall testified that he was at home on the evening of the shooting,

22  and that after hearing loud voices outside, he looked out of his front window to see what

23  was going on.  Marshall testified that he observed at least two African-American teenagers

24  standing near a station wagon parked in front of his driveway in the street, and that he saw

25  another group of teenagers standing by the stairs to his neighbor Marcus Hawkins' house,

26  ───────────────

27       [2] Ramsey testified at a preliminary hearing that he was robbed, but the prosecution argued at trial that there was no admissible evidence that a robbery occurred, based largely on the fact that the defense did not call Ramsey to testify at trial.

28

**United States District Court**
For the Northern District of California

1   including Hawkins, Bagwell, and Ramsey.

2        When Marshall first looked out the window, he testified that there did not seem to be

3   a fight or an altercation between the two groups of people, and he did not see any

4   weapons, so he left his window and went about his business.  However, he subsequently

5   heard gunshots and then went back to his window.  While he was away from the window,

6   Marshall could still hear that there was a conversation outside, but reported that the tone

7   subsequently increased in urgency.

8        When he went back to the window after hearing the shots, he saw the teenagers

9   that had been surrounding the Walker station wagon run away at the sound of the gunfire.

10  Marshall testified that he observed Rodriguez shooting the gun.  Marshall also observed

11  one of the fleeing teenagers fall to the ground in the street.  After the shooting, Marshall

12  witnessed a fist fight break out among the Walker group and the Melrose group.

13                    **b.    Armando Salazar**

14       The prosecution also called Armando Salazar, another Melrose Avenue resident,

15  and a neighbor of Rodriguez's.  Salazar arrived home at 5:45 p.m. on March 3, 1998.

16  While he was still in his vehicle in front of his house, he noticed the Walker group's station

17  wagon parked in front of his neighbor and prosecution witness, Marshall's house, and he

18  subsequently saw nine or ten African-American teenagers jump out of the station wagon.

19  At that point, Salazar entered his home because he had never seen the teenagers before,

20  and told his wife to collect their kids from the backyard because the strange teenagers in

21  the street made him nervous.  However, Salazar testified that the teenagers were not

22  fighting at that time.

23       When the Walker teenagers exited the station wagon, Salazar saw that one of them

24  had a beer and another one urinated on a lawn.  He testified that the teenagers were loud,

25  but that he did not see any weapons on the Walker group, and that he did not observe the

26  group fighting before the shots were fired.  Salazar did not observe an altercation until he

27  heard a gunshot three or four minutes later.  At that point, he looked out of his kitchen

28

                                            4

United States District Court

For the Northern District of California

1  window and observed Rodriguez holding a gun.  When Rodriguez finished shooting, he
2  turned and walked back into his house.

3      Salazar testified that he saw the teenagers run away when the shooting started.
4  Subsequently, the members of the two teenage groups started fighting.

5                  **c.    Officer Morse**

6      Officer Morse participated in pulling over the Walker station wagon containing
7  Walker group members Ferrari Johnson and Damion Brown after the shooting.  He testified
8  that the officers did not find a weapon in the Walker car.

9      **2.    Defense Witnesses**

10     Rodriguez's defense was that he fired the gun to protect his friends from members
11 of the Walker group, who were robbing them.  Only Rodriguez and Breshell testified for the
12 defense.

13                 **a.    Thurston Breshell**

14     Breshell testified that he was present on the 4700 block of Melrose Avenue at the
15 time of the March 3, 1998 shooting.  He attested that he and Ramsey were standing
16 outside of a car occupied by Alberty and Jackson when they saw the Walker station wagon
17 drive by.

18     Breshell testified that the car drove by slowly, and that he observed someone who
19 appeared to be laying down suspiciously in the back seat of the car.  Breshell then saw the
20 Walker car make a u-turn on 48th Avenue and park near the stop sign at the corner.  At
21 that point, Breshell testified that five people got out of the station wagon, broke a wine
22 bottle, talked to Hawkins, and approached the Melrose group.  According to Breshell, their
23 group then split: one group remained at the Jackson-Alberty car and the other group
24 moved in front of Marshall's house.

25     Then, a member of the Walker group went back to their station wagon and pulled it
26 "halfway on the side of the" Jackson-Alberty car.  Breshell described the atmosphere as
27 "hostile" when the Walker car pulled alongside the Jackson-Alberty car.  After pulling to an

28

5

United States District Court
For the Northern District of California

abrupt stop, the driver of the Walker car exited the car and talked loudly to Breshell.  At this point, Breshell saw Ramsey walking towards Rodriguez's house.  Breshell did not see Ramsey get robbed.

The Walker group then grabbed Breshell and tried to get into his pockets.  As Breshell was trying to fight off two members of the Walker group, Alberty and Jackson drove away in their car.  Breshell testified that he saw a third member of the Walker group, who might have been the victim, approach him, and also saw this person reach in his jacket for a gun.  Breshell testified that he saw the handle of a gun tucked into the waistband of this person's pants.  Breshell punched this approaching member of the Walker group before he could get the gun out of his pants.[3]

Breshell then heard a gunshot and ran away.  He ran towards Rodriguez's house.  The members of the Walker group who had been attacking Breshell then drove away in their station wagon.  Breshell testified that he thought Rodriguez was protecting him (Breshell) when he fired the shots, including the one that hit Walker.

Breshell testified that he then went inside Rodriguez's house and was there when the police arrived.  Breshell stated that he never talked to the police even though he had been personally involved in the altercation.  He explained that the police make him nervous.

### b.    Rodriguez

Rodriguez testified that he was in his bedroom between 5:00 and 6:00 p.m. on March 3, 1998, when he heard loud noises from outside the house.  He left his bedroom and his house, and walked down toward the street on Melrose Avenue to investigate.

When he got to the street, he saw "a lot of commotion."  Rodriguez observed some people whom he recognized, including Breshell, Ramsey, Jackson, Hawkins, and Bagwell, and five other people that he did not recognize.  He did not see any fighting when he first

---

[3]The court notes that at trial, the prosecution emphatically argued that the Walker group had no guns or weapons.

6

1    observed the large group of people.

2    Rodriguez testified that Ramsey crossed the street and approached him, as

3    Rodriguez kept an eye on the altercation between the Melrose group and the Walker group.

4    Rodriguez testified that Ramsey then told him that he had just been robbed. [4]

5    Rodriguez then observed the Walker group start to "go[] through [Breshell's]

6    pockets," and saw Breshell struggling with the Walker group.  Ramsey shouted to the

7    Walker group to leave Breshell alone because Ramsey was the one with marijuana.

8    Rodriguez knew that Ramsey had a gun and asked Ramsey why he had not used it

9    against the Walker group as they were robbing him.  Rodriguez then told Ramsey to shoot

10   the gun in the air to scare off the Walker group, but Ramsey instead pushed the gun into

11   Rodriguez's hands.  Rodriguez saw the Walker group crossing the street toward him, and

12   he twice fired the gun into the air.  Two teenagers retreated, but two continued to hassle

13   Breshell.  Rodriguez told the remaining two to "get off" Breshell, and when they did not,

14   Rodriguez fired the gun three more times at approximately a twenty-degree angle.

15   Rodriguez conceded that he never observed a gun on any member of the Walker

16   group, but nevertheless testified that he shot the gun to protect Breshell.  He thought that

17   the altercation between the Walker group and the Melrose group was "more than a fist

18   fight."

19       **3.    Prosecution Rebuttal**

20   In rebuttal, the prosecution called two officers to testify in order to call into question

21   Breshell's credibility.  Officer Bardsley, the officer who canvassed the neighborhood after

22   the shooting to get statements from potential witnesses, testified that he entered

23   Rodriguez's home to interview people at the residence and he did not observe any African-

24   American males at that house.  In other words, Bardsley did not see Breshell, who had

25   earlier testified that he was present when the police came to Rodriguez's house.  Sergeant

26   _____

27       [4]Because it was hearsay, the trial court admitted Rodriguez's testimony regarding what
     Ramsey told him not for the truth but to explain Rodriguez's state of mind, and the jury was
28   given a limiting instruction to that effect.

7

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  Holloman similarly testified that he did not see Breshell when he conducted interviews at

2  Rodriguez's house.

3  **4.    Closing Arguments**

4  During closing arguments, the prosecution conceded that the case "made no sense,"

5  and argued that the victim was dead because of "a senseless act."  Although it did not offer

6  a motive for the shooting, the prosecution emphasized that the shooting was not justified or

7  excusable, nor did it constitute a crime committed in the heat of passion or a case of

8  imperfect self-defense.

9  The defense, on the other hand, argued that the use of deadly force was justified

10  because Rodriguez was defending Breshell, who was being robbed.  In her closing

11  argument, counsel argued that Rodriguez had just been told by Ramsey that Ramsey had

12  been robbed right before he approached Rodriguez, immediately prior to Rodriguez

13  personally observing his friend, Breshell, in an altercation with two members of the Walker

14  group, who appeared to be robbing Breshell.

15  **C.    Federal Habeas Proceedings**

16  This case has a somewhat long and convoluted history before this court.

17  On June 7, 2004, Rodriguez filed his original pro se habeas corpus petition in this

18  court.  The handwritten petition appeared to include two grounds for relief: (1) a claim

19  based on trial counsel's failure to investigate, and (2) a claim that the state trial court erred

20  in giving a jury instruction.  In addition to his handwritten petition, Rodriguez attached eight

21  exhibits, A-H, which he had previously submitted to the California Supreme Court with his

22  state habeas petition.

23  On July 6, 2004, this court issued an order dismissing the petition with leave to

24  amend, noting that it could not determine the nature of the claims from the petition.

25  Subsequently, on August 11, 2004, the court received a letter from William Foskett

26  ("Foskett"), an investigator who had previously been assigned to Rodriguez's case by the

27  Alameda County Public Defender's office.  As background, Foskett noted that he had

28

8

**United States District Court**
For the Northern District of California

1   worked as an officer for the Oakland Police Department for twenty years, subsequently

2   worked as an investigator for the Alameda County Public Defender's Office, and later

3   earned a law degree.  Foskett's letter to the court detailed his concerns about the way

4   Rodriguez's case had been handled by his trial counsel, Pauline Weaver.  Foskett asked

5   the court to pay special attention to Rodriguez's case, and requested that the court appoint

6   counsel for him.

7       On October 26, 2004, the court issued an order granting an extension of time for

8   Rodriguez to amend the original petition.  The court noted that its prior order had been

9   returned as undeliverable, and the clerk sent another copy of the prior July 6, 2004 order to

10  the address previously supplied by Rodriguez.  Additionally, the court asked that another

11  copy be sent to Foskett to ensure that Rodriguez would receive it.

12      On November 1, 2004, in response to the order, Foskett sent another letter to the

13  court providing an updated address for Rodriguez.  Foskett also stated in the letter that

14  Rodriguez did not have the intellectual capacity to prosecute his habeas case and again

15  requested the court to appoint counsel for Rodriguez.

16      On November 24, 2004, Rodriguez, still pro se, filed an amended petition.  In the

17  amended petition, Rodriguez asserted that he was entitled to relief based on claims that:

18      (1) his counsel was ineffective in failing to hire an investigator to investigate the facts

19      of his case, as detailed in a letter from Foskett;

20      (2) the trial court erred in giving incomplete instructions and in not giving him a copy

21      of one of the instructions; and

22      (3) his trial counsel had a conflict of interest because Rodriguez had discharged her

23      earlier in the case.

24      Rodriguez attached the same typewritten document that accompanied his original

25  petition. Additionally, he included another letter from Foskett detailing the weaknesses that

26  Foskett perceived in the defense's pretrial investigation of Rodriguez's case.

27      On December 12, 2004, the court issued an order to show cause requiring the state

28

9

United States District Court

For the Northern District of California

to respond to issues one and three, but dismissed the second issue regarding the jury instructions because it did not present a federal constitutional issue.  On June 20, 2005, the state filed a motion to dismiss for failure to exhaust, in which it argued that one of the two remaining claims - that regarding Rodriguez's trial counsel's alleged conflict of interest - was unexhausted in state court.  Therefore, the state argued that the case should be dismissed until Rodriguez exhausted the conflict of interest claim in state court.

Rather than opposing the state's motion to dismiss, Rodriguez sent the court two letters, one on August 25, 2005, and another on December 22, 2005, requesting a status report for his case.  Additionally, on January 3, 2006, Foskett wrote another letter to the court on behalf of Rodriguez's mother requesting a status report.

Rodriguez ultimately failed to oppose the state's motion to dismiss, and on March 13, 2006, the court granted the state's motion to dismiss the conflict of interest claim as unexhausted with leave to amend.  In light of Rodriguez's pro se status, the court carefully delineated Rodriguez's three options going forward, noting that he could: (1) voluntarily dismiss the case and exhaust the unexhausted claim in state court; (2) amend the petition to delete the unexhausted issue so that the court could proceed on the one exhausted issue; or (3) ask the court for a stay of the federal proceedings to afford him the opportunity to exhaust the second claim in state court.

On March 27, 2006, Rodriguez submitted a letter to the court requesting to amend his petition to remove the unexhausted claim regarding his trial counsel's alleged conflict of interest.  In a March 30, 2006 order, the court treated Rodriguez's letter as an adequate amendment, deemed the petition amended, and directed the state to file an answer to Rodriguez's petition within sixty days.  Accordingly, only the ineffective assistance of counsel claim remained.

After the state filed its answer and the state court record on May 2, 2006, Rodriguez filed a two-page handwritten response on June 8, 2006, that purported to be his traverse.  In support, Rodriguez appended another letter from Foskett.  Foskett had apparently

**United States District Court**
For the Northern District of California

reviewed the state's answer and drafted a letter to Rodriguez analyzing the state's arguments and advising him how to proceed.  Rodriguez's traverse paraphrased Foskett's letter.

On May 28, 2006, Rodriguez filed a motion requesting the court to appoint him counsel.  Rodriguez stated that he did not have the requisite legal knowledge to adequately proceed with his habeas petition.  Subsequently, on January 26, 2007, the court received another letter from Foskett.  This letter, similar to many of the previous letters, explained Foskett's role in the original investigation of the case and Foskett's opinions about the quality of the defense.  Additionally, Foskett reiterated his belief that the court should appoint Rodriguez counsel.

On March 1, 2007, the court granted Rodriguez's request for appointment of counsel and stayed the habeas proceedings pending such appointment.  On April 26, 2007, after counsel was appointed for Rodriguez, the court issued an order for supplemental briefing by Rodriguez, allowing newly appointed counsel to supplement the traverse that Rodriguez had previously filed pro se because the original traverse was inadequate.

On September 17, 2007, with the assistance of his appointed counsel, Rodriguez filed a supplemental traverse and a request for an evidentiary hearing.  Rodriguez elaborated on his ineffective assistance of counsel claim, asserting that his trial counsel was ineffective for (1) failing to present testimony from witnesses who were located and interviewed by Investigator Foskett prior to trial, who he claimed would have supported his defense that the homicide was justified, including Roy Ramsey, Elaine Caufield, and Dennis Lyons; and (2) for failing to locate and investigate additional witnesses who were available and who would have testified that Rodriguez's role in the homicide was justified, including Kenneth Jackson and Vonree Alberty.

Rodriguez argued that the additional witnesses would have substantiated the defense's position that the victim and/or the victim's friends were committing a robbery or robberies at the time the victim was shot.  Accordingly, Rodriguez contended that the

United States District Court

For the Northern District of California

1   additional witnesses would have supported his defense at trial that the homicide was

2   justified in that he acted reasonably in the defense of another, or alternatively, that the

3   evidence would have supported a conviction on the lesser-included offense of voluntary

4   manslaughter by suggesting to the jury that Rodriguez acted honestly but unreasonably in

5   the defense of another or in the heat of passion.

6          In support, Rodriguez attached six exhibits to his supplemental traverse, which were

7   not previously a part of this court's record, nor were they a part of the record before the

8   California Supreme Court.  Those exhibits included: (1) a September 9, 2007 declaration

9   from Scott Whitney; (2) a September 10, 2007 declaration from Vonree Alberty; (3) a

10  September 16, 2007 declaration from Kenneth Jackson; (4) a May 3, 1999 interview report

11  of Dennis Lyons; (5) a September 16, 2007 declaration from Foskett; and (6) a May 7,

12  1999 interview report for Elaine Caufield.[5]

13         On September 26, 2007, the court issued an order for further briefing and for

14  additional documents from the state court record.  The court noted that in his petition and

15  the papers filed to date, Rodriguez had contended that he received ineffective assistance of

16  counsel based on his trial counsel's failure to adequately investigate the facts of his case, a

17  claim which had been detailed in Foskett's supporting letters.  However, in his

18  supplemental traverse, the court noted that Rodriguez argued as well that trial counsel's

19  failure to present evidence at trial (including witnesses who had been interviewed)

20  constituted ineffective assistance of counsel.  In an effort to determine whether the issue,

21  as framed by Rodriguez in his supplemental traverse, was exhausted before the state

22  courts, the court ordered the state to submit the actual order from the California Court of

23  Appeal and a copy of Rodriguez's February 7, 2003 state habeas petition.  The court

24  further afforded the state the opportunity to respond to Rodriguez's supplemental traverse

25  and request for an evidentiary hearing.

26         On November 11, 2007, the state filed another motion to dismiss Rodriguez's

27  ───────────────

28         [5]Caufield has since passed away.

12

United States District Court

For the Northern District of California

1    habeas petition as untimely and unexhausted.  It argued that as framed by Rodriguez's

2    supplemental traverse, his ineffective assistance of counsel claim was unexhausted, and

3    that to the extent he sought to raise a new, unexhausted claim, it was untimely because it

4    fell outside of the Antiterrorism and Effective Death Penalty Act's ("AEDPA") statute of

5    limitations.

6         On March 4, 2008, following Rodriguez's opposition and the state's reply, the court

7    stayed the federal habeas proceedings so that Rodriguez could return to state court to fully

8    exhaust the claim.  In concluding that a stay was appropriate, the court held that the new

9    evidence and arguments presented by Rodriguez in his supplemental traverse, although

10   related to his claim before the state court, placed his ineffective assistance of counsel claim

11   in a significantly stronger evidentiary posture.  Specifically, the court noted that only two

12   witnesses testified at trial in support of Rodriguez's position that the victim was shot in the

13   defense of others who were being robbed by the victim and the victim's friends at the time

14   of the shooting - Rodriguez and Thurston Breshell.  Four of the supplemental exhibits

15   submitted to this court - the declarations and interview memoranda from Alberty, Jackson,

16   Caufield, and Lyons - corroborated Rodriguez's and Breshell's testimony and provided

17   additional details regarding the scene of the crime, including the alleged robberies,

18   Rodriguez's conduct, and the conduct of the numerous other witnesses present that day.

19   The court noted that those exhibits also corroborated the preliminary hearing testimony of

20   Roy Ramsey, whose failure to testify at trial provided the underlying factual basis for

21   Rodriguez's state court ineffective assistance of counsel claim.

22        Additionally, in granting the stay, the court noted that following exhaustion,

23   Rodriguez would be permitted to amend his federal habeas petition to include the newly

24   exhausted claim.  In support, it concluded that because the claim contained in his pro se

25   amended federal petition and the claim detailed in his supplemental traverse were tied to a

26   common core of operative facts, the exhausted claim would relate back to the timely-filed

27   claim stated in Rodriguez's November 24, 2004 amended habeas petition.

28

**United States District Court**
For the Northern District of California

1   Rodriguez subsequently presented the claim to the California Supreme Court, along

2   with all of the additional exhibits that he filed with his supplemental traverse before this

3   court.  On July 15, 2009, the California Supreme Court summarily denied his habeas

4   petition.

5   On July 24, 2009, this court reopened the case, and noted that the state had not

6   previously had an opportunity to address Rodriguez's supplemental traverse on the merits.

7   The court thus afforded the state an opportunity to file a supplemental opposition brief, and

8   for Rodriguez to file a supplemental reply, which both parties did.

9                                           **ISSUE**

10   Rodriguez claims that his trial counsel provided ineffective assistance of counsel

11   when she failed to adequately investigate and present testimony from numerous additional

12   witnesses who would have supported Rodriguez's defense.

13                                  **STANDARD OF REVIEW**

14   This court may entertain a petition for writ of habeas corpus "on behalf of a person

15   in custody pursuant to the judgment of a state court only on the ground that he is in custody

16   in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. §

17   2254(a).  Because the petition in this case was filed after the effective date of the AEDPA,

18   the provisions of that act apply here.  *See Lindh v. Murphy*, 521 U.S. 320, 327 (1997).

19   Under the AEDPA, a district court may not grant a petition challenging a state conviction or

20   sentence on the basis of a claim that was reviewed on the merits in state court unless the

21   state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or

22   involved an unreasonable application of, clearly established Federal law, as determined by

23   the Supreme Court of the United States; or (2) resulted in a decision that was based on an

24   unreasonable determination of the facts in light of the evidence presented in the State court

25   proceeding."  28 U.S.C. § 2254 (d).

26   A state court decision is "contrary to" Supreme Court authority, falling within the first

27   clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that

28

                                           14

United States District Court

For the Northern District of California

1   reached by [the Supreme] Court on a question of law or if the state court decided a case

2   differently than [the Supreme] Court has on a set of materially indistinguishable facts."

3   *Williams v. Taylor*, 529 U.S. 362, 412-413 (2000).  "Clearly established federal law" under §

4   2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at

5   the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72

6   (2003).  This "clearly established" law "refers to the holdings, as opposed to the dicta, of

7   [Supreme] Court decisions as of the time of the relevant state court decision." *Id.*

8       "Under the 'unreasonable application' clause" of § 2254(d)(1), a federal habeas court

9   may grant the writ if the state court identifies the correct governing legal principle from [the

10  Supreme] Court's decisions but unreasonably applies that principle to the facts of the

11  prisoner's case." *Id.* at 74.  However, this standard "requires the state court decision to be

12  more than incorrect or erroneous." *Id.*  For the federal court to grant habeas relief, the

13  state court's application of the Supreme Court authority must be "objectively unreasonable."

14  *Id.* at 74-75.  The "objectively unreasonable" standard is different from the "clear error"

15  standard in that "the gloss of clear error fails to give proper deference to state courts by

16  conflating error (even clear error) with unreasonableness." *Id.* at 75; *see also Clark v.*

17  *Murphy*, 331 F.3d 1062, 1068 (9th Cir. 2003).  Therefore, "[i]t is not enough that a habeas

18  court, in its independent review of the legal question, is left with a firm conviction that the

19  state court was erroneous . . . Rather, the habeas court must conclude that the state

20  court's application of federal law was objectively unreasonable." *Andrade*, 538 U.S. at 75;

21  *see also Clark*, 331 F.3d at 1068.

22      As for state court findings of fact, under § 2254(d)(2), a federal court may not grant a

23  habeas petition by a state prisoner unless the adjudication of a claim on the merits by a

24  state court resulted in a decision that was based on an unreasonable determination of the

25  facts in light of the evidence presented in the state court proceeding.  28 U.S.C. §

26  2254(d)(2).  The "clearly erroneous" standard of unreasonableness that applies in

27  determining the "unreasonable application" of federal law under § 2254(d)(1) also applies in

28

United States District Court

For the Northern District of California

1   determining the "unreasonable determination of facts in light of the evidence" under §

2   2254(d)(2).  *See Torres v . Prunty*, 223 F.3d 1103, 1107-1108 (9th Cir. 2000).  To grant

3   relief under 2254(d)(2), a federal court must be "left with a firm conviction that the

4   determination made by the state court was wrong and that the one [petitioner] urges was

5   correct."  *Id.* at 1108.

6   However, when the state court decision does not articulate the rationale for its

7   determination or does not analyze the claim under *federal* constitutional law, a review of

8   that court's application of clearly established federal law is not possible.  *See Delgado v.*

9   *Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000).  When confronted with such a decision, a

10  federal court must conduct an independent review of the record and the relevant federal

11  law to determine whether the state court's decision was "contrary to, or involved an

12  unreasonable application of, "clearly established federal law."  *Id.* at 982.

> When a state court does not furnish a basis for its reasoning, we have no
> basis other than the record for knowing whether the state court correctly
> identified the governing legal principle or was extending the principle into a
> new context. . . .[A]lthough we cannot undertake our review by analyzing the
> basis for the state court's decision, we can view it through the 'objectively
> reasonable' lens ground by *Williams* [, 529 U.S. 362]. . . . Federal habeas
> review is not de novo when the state court does not supply reasoning for its
> decision, but an independent review of the record is required to determine
> whether the state court clearly erred in its application of controlling federal
> law. . . .  Only by that examination may we determine whether the state
> court's decision was objectively reasonable.

19  *Id.*

20                                     **DISCUSSION**

21  **A.    Supplemental Exhibits**

22  As noted, Rodriguez submitted numerous exhibits with his federal habeas petition

23  and supplemental traverse that were also submitted to, and which this court must presume

24  to have been considered by, the California Supreme Court in conjunction with his May 27,

25  2003, and November 10, 2008 state habeas petitions.  Because all of the exhibits in the

26  record in this case were also in the record before the state courts that adjudicated

27  Rodriguez's claim on the merits, this court's review and consideration of those exhibits is in

28

accordance with the United States Supreme Court's recent decision in *Cullen v. Pinholster*. *See* 131 S. Ct. 1388,1398 (2001) (clarifying that the record under review in federal habeas proceedings is limited to the record that was before the state court that adjudicated the petitioner's claim on the merits).

Among these were Exhibits A-F, which are briefly described below.[6]

**i.    Exh. A:         Transcript of Ramsey's Preliminary Hearing Testimony**

Rodriguez argues that given that his defense counsel was unsuccessful obtaining Ramsey's testimony at trial, then, at a minimum, she should have sought to introduce Ramsey's preliminary hearing testimony.  This exhibit is the transcript of that testimony.

**ii.    Exh. B:        February 18, 1999 Transcript of Undated Law Enforcement**
**                         Interview with Ramsey**

This is a transcript of an interview that the police conducted with Ramsey following the shooting.

**iii.    Exh. C:        May 5, 1999 Report of Interview with Roy Ramsey by**
**                         Investigator Foskett**

Foskett provided this report to Rodriguez's trial counsel.  In the report, he evaluates Ramsey's demeanor, which he describes as "ok [] for a dope dealer."  The report also states that the Walker group robbed Ramsey, and that Ramsey observed the Walker group with at least four guns.

**iv.    Exh. D:        April 17, 2003 Declaration from Petitioner Salvador**
**                         Rodriguez**

This declaration was initially submitted with Rodriguez's state habeas petitions.

───────────────────

[6]Rodriguez also filed two additional exhibits, G and H, with his state and federal court habeas petitions.  Exhibit G is a copy of the Alameda County Superior Court's October 15, 2002 minute order denying his habeas petition.  Exhibit H is a printout of the California Court of Appeal's February 13, 2003 denial of his habeas petition.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    **v.    Exh. E:    Investigator Foskett's Log of Handwritten Notes re:**

2    **Investigation of Rodriguez's Case**

3    Foskett's notes catalogue his efforts to contact various witnesses prior to trial.

4    **vi.    Exh. F:    May 24, 2003 Declaration from Sandra Gillies**

5    Gillies was Rodriguez's attorney on direct appeal in the state appellate courts.

6  Among other things, Gillies attests that she inquired of Rodriguez's trial attorney, Pauline

7  Weaver, regarding why Weaver did not seek to introduce Ramsey's preliminary hearing

8  testimony at trial.  Gillies states that Weaver told her that Ramsey's testimony seemed "too

9  thin" to have had an impact on the jury.

10    In addition to the above exhibits, Rodriguez also attached six exhibits to his

11  September 17, 2007 supplemental traverse before this court, which he subsequently

12  submitted to the California Supreme Court with his November 10, 2008 state habeas

13  petition.

14    Those exhibits included the following:

15    **vii.    Exhibit AA:  September 16, 2007 Declaration of Scott Whitney[7]**

16    Whitney is a private investigator hired by Rodriguez's appointed federal habeas

17  counsel, Linda Fullerton.  His declaration details how he contacted and interviewed two

18  witnesses whom Rodriguez's trial counsel failed to locate and interview, Vonree Alberty

19  and Kenneth Jackson.  Whitney's interviews with Alberty and Jackson are detailed in the

20  declarations located at Exhibits BB and CC.

21    **viii.    Exhibit BB:  September 10, 2007 Declaration of Vonree Alberty**

22    As noted, Scott Whitney, the investigator hired by Rodriguez's habeas counsel,

23  obtained a statement from Alberty on September 10, 2007.  Alberty was present at the

24  scene of the shooting.

25

26  ───────────────

27    [7]These exhibits were labeled in the same manner as the prior eight exhibits.  In order
to distinguish the latter-filed exhibits from the former ones, the court has referred to the latter-
28  filed exhibits as Exhibits AA, BB, CC, DD, EE, and FF.

**United States District Court**
For the Northern District of California

1        **ix.**    **Exhibit CC:  September 16, 2007 Declaration of Kenneth Jackson**

2        As noted, Scott Whitney, the investigator hired by Rodriguez's habeas counsel,

3 obtained a statement from Jackson on September 16, 2007.  Jackson was present at the

4 scene of the shooting.

5        **x.**    **Exhibit DD:  May 3, 1999 Interview Report from Investigator Foskett re:**

6             **Dennis Lyons**

7        This is a report from Foskett regarding his pretrial interview with witness Dennis

8 Lyons.  Briefly, the report states that Lyons could testify that the Walker group was armed

9 and committing robberies at the time of the shooting.

10        **xi.**    **Exhibit EE:  September 16, 2007 Declaration from Walter Foskett**

11        This declaration details deficiencies in Rodriguez's trial counsel's performance that

12 Foskett observed and reported.  Specifically, Foskett states that he interviewed Lyons and

13 Caufield, but that neither testified at trial.  Additionally, Foskett describes how defense

14 counsel instructed him to cease his efforts to subpoena Ramsey and Lyons for trial.

15 Finally, Foskett states that, during the course of the investigation, he brought his concerns

16 about defense counsel's performance to the attention of the Assistant Public Defender but

17 that no reassignments were made based on his complaint.

18        **xii.**    **Exhibit FF:  May 7, 1999 Interview Report from Walter Foskett re: Elaine**

19             **Caufield**

20        This is a report from Foskett regarding his interview with witness Elaine Caufield.

21 The report states that Caufield heard loud voices coming from the street.  She then went

22 outside and witnessed a fight and some shooting.  Specifically, she noted that one of the

23 males she observed was armed, but she wasn't clear regarding whether he was a member

24 of the Walker group or the Melrose group.

25 **B.**    **Summary of Evidence Not Presented at Trial**

26        **1.**    **Roy Ramsey**

27 Ramsey was interviewed by both Foskett and the police several times prior to

28

**United States District Court**
For the Northern District of California

1   Rodriguez's trial, and also testified at the preliminary hearing.  As noted, in spite of this, he

2   did not testify at trial.

3        On June 17, 1998, Ramsey testified at the preliminary hearing as follows.  On March

4   3, 1998, he was hanging out on the sidewalk on Melrose Avenue with his friends, Breshell

5   and Alberty.  A station wagon (the Walker station wagon) drove past the Melrose group,

6   made a u-turn and parked on 48th Avenue.  Eight to ten African-American teenagers exited

7   the station wagon and approached the Melrose group.  The Walker group hovered near the

8   Melrose group without saying anything for approximately five minutes.

9        The Walker group then began demanding money from members of the Melrose

10  group, and going through the Melrose group members' pockets.  Ramsey gave the Walker

11  group three bags of marijuana.  Ramsey, however, did *not* give the Walker group the

12  "couple hundred" dollars he had on him.  Ramsey did not see any weapons on the Walker

13  group.  After he gave the Walker group his marijuana, Ramsey walked across the street to

14  where Rodriguez was standing, and told Rodriguez that he had just been robbed.

15       Ramsey then yelled at the Walker group to leave Jackson, another member of the

16  Melrose group, alone.  At that point, the altercation between the Walker group and

17  Jackson, Breshell, and Alberty heated up.  Jackson and Breshell were trading punches with

18  the Walker group.

19       Ramsey's gun was somehow transferred from Ramsey to Rodriguez, and Rodriguez

20  shot the gun in the air five times.  When Rodriguez finished shooting, he gave the gun back

21  to Ramsey.  Ramsey then disposed of the gun in a trash can three blocks away.

22       Prior to trial, Foskett was unable to easily locate Ramsey.  After phone calls, visits to

23  Ramsey's prior addresses, and interviews with Ramsey's friends and family, it became

24  obvious that Ramsey was trying to evade service of the subpoena.  Rodriguez's trial

25  counsel then instructed Foskett to discontinue his efforts to subpoena Ramsey.

26       His trial counsel also decided not to seek to introduce Ramsey's preliminary hearing

27  testimony at trial.  As noted, she later advised Rodriguez's appellate counsel that she made

28

United States District Court

For the Northern District of California

this decision because she viewed the preliminary hearing testimony as "too thin."

### 2.    Vonree Alberty

Alberty did not testify at trial and was not interviewed prior to trial.

In his declaration, Alberty stated that he was hanging out on Melrose Avenue with Jackson and Breshell on the day of the shooting.  Jackson and Alberty were in the car while Breshell stood next to the car on the sidewalk.  Ramsey was on Melrose Avenue, but was not necessarily in or next to the car at the time.

Alberty observed the Walker car drive by with approximately ten people in it.  He lost sight of the car when it turned onto 48th Avenue.  A little later, Alberty saw the same group of people walking down the sidewalk towards Jackson's car.  Alberty thought that something was suspicious so he got out of the car.  The two groups exchanged small talk, but the Walker group seemed to be acting suspiciously to Alberty.

Alberty stated that Ramsey seemed to be avoiding the Walker group.  After talking with Alberty for a bit, the Walker group then started to walk away.  Alberty got back in the car with Jackson.  However, the Walker group did not leave, but instead formed a huddle and began whispering to each other.  The Walker group then split into several groups:  two went to Jackson's side of the car, two went to Breshell, two were on the sidewalk behind Alberty's car door, and three or four more were somewhere behind the car.  Hawkins, a member of the Melrose group, was also present at this point.

The Walker group then aggressively questioned Jackson and Alberty about whether they had any drugs.  Alberty stated that the Walker group was attempting to rob them.  Alberty did not see any weapons, though.  Alberty then saw Breshell start pushing and slapping the two guys surrounding him.  Alberty was not sure whether they were fighting or whether the Walker group was trying to rob Breshell.  Alberty, who had since gotten back into the car, then jumped out of the car again to help Breshell.  He started fighting with the Walker group.

Alberty heard four shots come from behind him.  He believed these shots came from

**United States District Court**
For the Northern District of California

the Walker group.  Alberty then heard another four shots come from a different direction, shot from a seemingly different caliber gun.  Everyone dropped to the ground at the sound of the gunshots.  When the shots stopped, Alberty stood up and noticed someone on the ground.  He was laying in the area where Alberty believed the shots originated.

The Walker car then pulled up, members of the Walker group got into the car, and the car left the scene.  Similarly, Jackson and Alberty drove away from the scene.

Alberty also recounted a threatening experience he had with the Walker group a few months after the shooting.  Alberty was identified by members of the Walker group while he was at a store.  The members of the Walker group then followed Alberty to his neighborhood.  While Alberty hid in his sister's house, he saw the members of the Walker group searching the neighborhood for him.  Alberty stated that he observed all of the members of the search group with guns.

### 3.    Kenneth Jackson

Jackson did not testify at trial and like Alberty, he also was not interviewed by the defense prior to trial.

In his declaration, Jackson stated that prior to the shooting, he was hanging out, sitting in his parked car on Melrose Avenue.  Ramsey, Alberty, and Breshell were hanging out with him in and around the car.  At some point, Ramsey moved down the street, Alberty got in the passenger side of Jackson's car, and Breshell remained next to the car.

Jackson then saw a station wagon occupied by nine people, the Walker car, drive by.  As they drove by, Jackson noticed that they looked at the Melrose group aggressively.  The Walker car made a u-turn on 48th Avenue and parked near the corner.  Hawkins, another member of the Melrose group, was close to the Walker group as they got out of their car at the corner.

The Walker group started to approach the Melrose group.  Five members of the Walker group surrounded Ramsey, two remained close to where they had parked their car, and two more approached Jackson's car.  At this point, Jackson noticed that the members

22

**United States District Court**
For the Northern District of California

1   of the Walker group were carrying open bottles of alcohol, and that the two who were

2   approaching Jackson's car briefly stopped to urinate on a lawn.  The members of the

3   Walker group who were not surrounding Ramsey appeared to Jackson to be acting as

4   lookouts.

5        In his car's rearview mirror, Jackson saw Ramsey giving the contents of his pockets

6   to a member of the Walker group.  Then, a member of the Walker group pulled the station

7   wagon into the middle of the street and parked it behind Jackson's car.  The driver got out

8   of the station wagon and aggressively approached Jackson.  Jackson stated that he

9   understood this person's actions as an attempt to rob him.

10       Jackson then heard Ramsey yell to the driver that Jackson didn't have any drugs

11  and that the Walker group should leave Jackson alone.  Apparently in response, the driver

12  then approached Breshell instead.  Other members of the Walker group who had

13  previously been acting as lookouts also approached Breshell at this point.  Breshell then

14  punched the driver of the Walker group in the face.

15       Jackson and Alberty began to exit the car to help Breshell.  However, as soon as

16  they got out of the car, Jackson heard a gunshot. Jackson ducked, got back in his car, and

17  started the engine.  Jackson then heard two more shots.  Alberty got back in the car, and

18  Jackson and Alberty drove away.

19       Jackson stated that he did not see any guns on the Walker group.

20       **4.    Dennis Lyons**

21       Foskett interviewed Lyons prior to trial on May 3, 1999.  Lyons stated that he was

22  present when the shooting occurred on March 3, 1998.  Lyons was hanging out with friends

23  on Melrose Avenue when the Walker station wagon approached.  The station wagon

24  stopped, and "a lot of guys" exited the car.  Lyons saw that at least one of them had a gun.

25       Lyons observed the Walker group rob Ramsey and then commence robbing

26  Breshell, but Breshell fought back.  At this point, Lyons knew there was going to be trouble

27  because the Walker group was armed and committing robberies, so he started to walk

28

United States District Court

For the Northern District of California

1    away.  As he was walking away, he heard gunshots and turned to look back.  He saw

2    people scattering.  He then ran down the street to escape.

3         Lyons thought that the Walker group had done the shooting.  He only learned later

4    that it was Rodriguez who shot the gun.

5         Foskett also had trouble finding Lyons to serve the subpoena for the January 11,

6    2000 court date.  Similar to Ramsey, he made phone calls, visited Lyons' prior addresses

7    and questioned Lyons' friends and family.  For reasons unexplained, Weaver later told

8    Foskett to cease efforts to locate Lyons prior to the time when the final prosecution witness

9    testified at Rodriguez's trial.

10        **5.     Elaine Caufield**

11        Foskett interviewed witness Elaine Caufield on May 7, 1999.  Caufield, who lived on

12   Melrose Avenue, was sitting in her front room with her windows open on the day of the

13   shooting.  At some point the voices became louder and the Walker car arrived and parked

14   in front of her house.  Caufield went out onto the sidewalk.  Five African-American males

15   exited the Walker car and approached the Melrose group.  She then saw a fight and some

16   shooting.  She observed one of the African-American males with a gun in his right hand.

17   After she heard two shots, she looked up and saw this individual put the gun behind his

18   back.  The police arrived shortly thereafter but did not detain the person with the gun.

19   Instead, Caufield observed him get back into a car and leave the scene.

20        Prior to trial, defense counsel asked Foskett to find and subpoena Caufield.  Foskett

21   located Caufield in the hospital.  When Weaver learned that Caufield was in the hospital,

22   she instructed Foskett not to serve her with a subpoena, and Caufield therefore was not

23   called to testify at trial.

24   **C.     Parties' Arguments**

25        As noted, Rodriguez does not challenge the fact that he shot Walker.  Rather, he

26   challenges his trial attorney's failure to adequately investigate witnesses and to present

27   evidence and testimony to the jury that he claims would have justified his use of deadly

28

United States District Court

For the Northern District of California

1  force.

2      Rodriguez's ineffective assistance claim concerns essentially three groups of

3  percipient witnesses discussed above: (1) Caufield and Lyons, witnesses who were

4  identified, interviewed, but not subpoenaed to testify at trial; (2) Jackson and Alberty,

5  witnesses who were never identified nor interviewed by the defense, and, therefore, were

6  never subpoenaed to testify at trial and (3) Ramsey, the witness who was identified,

7  interviewed, and testified at the preliminary hearing but who was *not* subpoenaed to testify

8  at trial and whose preliminary hearing testimony trial counsel did not seek to introduce at

9  trial.

10      Rodriguez argues that trial counsel's failure to put these five additional witnesses on

11  the stand during the trial constituted ineffective assistance of counsel.  He contends that

12  the corroborative nature of these five witnesses' potential testimony would have overcome

13  the prosecution's efforts to discredit the testifying defense witnesses' credibility.  In short,

14  Rodriguez argues that the additional five witnesses' cumulative testimony would have

15  presented a clearer picture of the aggressiveness and dangerousness of the Walker group

16  to the jury, thereby bolstering Rodriguez's defense of justified use of deadly force.

17      Specifically, regarding the first group, Caufield and Lyons, Rodriguez's trial counsel

18  asked Foskett to find and subpoena Lyons and Caufield on January 5, 2000 for a January

19  11, 2000 court date.  Rodriguez asserts that the relatively short time period that Weaver

20  gave Foskett to find and serve these witnesses made it extremely difficult for Foskett to

21  successfully do his job.  Moreover, trial counsel, without explanation, later ordered Foskett

22  to cease efforts to find and serve Lyons.  Similarly, when trial counsel learned that Caufield

23  was in the hospital, she ordered Foskett to make no further attempts to subpoena Caufield;

24  she also did not make alternative arrangements to have Caufield's testimony preserved

25  and admitted at trial.  Additionally, Rodriguez argues that Weaver herself had not talked to

26  Lyons or Caufield, so it was impossible for her to evaluate the necessity of their testimony

27  at trial.

28

United States District Court
For the Northern District of California

1    Rodriguez argues that testimony from Lyons and Caufield could have established

2   that the Walker group was armed and acting aggressively at the time of the shooting.

3   Rodriguez contends that even if these witnesses' testimony was cumulative of defense

4   witness Breshell's testimony, they were nevertheless necessary because the prosecution

5   called into question Breshell's credibility and the defense needed to provide corroboration

6   of his testimony.  Additionally, Rodriguez asserts Caufield and Lyons would have been

7   regarded as more objective than Breshell, the testifying defense witness, because they

8   were not friends with Rodriguez.

9    Regarding the second group, Jackson and Alberty, Rodriguez contends they would

10  have established that the Walker group was robbing Ramsey and Breshell when the

11  shooting occurred.   As for any suggestion that Jackson and Alberty could not be located at

12  the time of trial, Rodriguez argues that this is speculative and that there is no indication that

13  the defense ever attempted to locate Jackson or Alberty.  Rodriguez further contends that

14  even if Jackson and Alberty's testimony may have been cumulative to Breshell's, it was

15  necessary to bolster Breshell's credibility.

16   Regarding Ramsey, Rodriguez asserts that Weaver's failure to introduce his

17  testimony left the defense without any corroborating evidence that Rodriguez in fact

18  thought that Breshell was being robbed.  Rodriguez notes that Ramsey was the person

19  who advised him that he had been robbed, and that Ramsey also advised Rodriguez that

20  Breshell was being robbed.  Because Ramsey never testified, Rodriguez argues the

21  defense never produced evidence at trial that Ramsey had actually been robbed before the

22  shooting, and this undermined the defense strategy of justified use of deadly force.

23   In sum, Rodriguez contends that the crux of his defense strategy was to convince

24  the jury that his friends were being robbed by the Walker group, and that the resulting

25  danger to his friends justified or mitigated his use of deadly force.  According to Rodriguez,

26  trial counsel's failure to investigate and present sufficient testimony to support the justified

27  use of deadly force defense allowed the prosecution to shift the focus of the case.  Instead

28

United States District Court

For the Northern District of California

1   of focusing on the threatening circumstances prior to the shooting, the trial focused on the

2   shooting itself.  He argues that because justified use of deadly force was a central aspect

3   of his defense, "competent [defense] counsel would have made a strong effort to locate

4   and interview all percipient witnesses."

5          In response, regarding the first group of witnesses, the state argues that Weaver's

6   investigator, Foskett attempted to subpoena both Caufield and Lyons, but that he was

7   unsuccessful for various reasons.  As for Caufield, the state asserts that Foskett located

8   Caufield in the hospital and that she was apparently incapable of coming to court.

9   Therefore, according to the state, it was reasonable for Weaver not to pursue Caufield as a

10  witness because of her general unavailability.  Additionally, the state argues that the

11  statement that Caufield gave to Foskett was unclear as to which group was armed.

12  Further, the state argues that even if the defense could establish through Caufield's

13  testimony that the Walker group was armed, it would have been merely cumulative of

14  Breshell's testimony.

15         Regarding Lyons, the state notes that the trial began on January 4, 2000, and that

16  Foskett made several attempts to locate Lyons between January 5 and January 9, 2000.

17  The state argues that reasonable counsel could conclude that even if Lyons could have

18  been found, it would have been too late in the course of the trial to adequately prepare him

19  to testify, and therefore it was reasonable for counsel to direct Foskett to cease his efforts

20  to find and serve Lyons.  Additionally, the state argues that Lyon's testimony would have

21  been cumulative of Breshell's testimony and was, therefore, unnecessary for the defense.

22         Turning to Alberty and Jackson, the state argues that their current declarations do

23  not establish that Rodriguez's trial counsel was ineffective for failing to locate them and call

24  them as witnesses.  It contends that their willingness to cooperate with Rodriguez's

25  defense at this point – ten years after the shooting – may not be indicative of their

26  willingness to cooperate at the time of trial.  Furthermore, the state argues that their

27  testimony is merely cumulative of Breshell's testimony and would not have changed the

28

United States District Court

For the Northern District of California

1   outcome of the trial even if the defense had successfully located and subpoenaed them.

2       Finally, regarding Ramsey, the state notes that Weaver did ask Foskett to subpoena

3   Ramsey, and that Foskett made several attempts to find Ramsey.  The state suggests that

4   Ramsey was not successfully subpoenaed because he was actively evading service.

5   Therefore, it argues that the only real issue is Weaver's failure to introduce Ramsey's

6   preliminary hearing testimony at trial.  It contends that counsel's decision not to introduce

7   Ramsey's preliminary hearing testimony was reasonable because Ramsey's prior

8   testimony conflicted on several key points with Rodriguez's trial testimony.  As a result,

9   according to the state, the prosecution could have emphasized the conflicting nature of the

10  testimony, Ramsey's bias as Rodriguez's friend, and Ramsey's criminal history to attack his

11  credibility.  Furthermore, the state argues that the benefits of Ramsey's prior testimony

12  would have been marginal, and asserts that it would have been merely cumulative.

13  **D.    Analysis**

14      **1.    Legal Standards**

15      In order to prevail on a Sixth Amendment ineffective assistance of counsel claim, a

16  petitioner must establish two things.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

17  First, he must establish that counsel's performance was deficient, i.e., that it fell below an

18  "objective standard of reasonableness" under prevailing professional norms.  *Id.* at 687-88.

19  Second, he must establish that he was prejudiced by counsel's deficient performance, i.e.,

20  that "there is a reasonable probability that, but for counsel's unprofessional errors, the

21  result of the proceeding would have been different."  *Id.* at 694.  A reasonable probability is

22  a probability sufficient to undermine confidence in the outcome.  *Id.*

23      A "doubly" deferential judicial review is appropriate in analyzing ineffective

24  assistance of counsel claims under § 2254.  *See Harrington v. Richter*, 131 S. Ct. 770, 788

25  (2011); *Premo v. Moore*, 131 S. Ct. 733, 740 (2011) (same).  When § 2254(d) applies, "the

26  question is not whether counsel's actions were reasonable.  The question is whether there

27  is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."

28

United States District Court

For the Northern District of California

1   *Harrington*, 131 S. Ct. at 788.

2       A showing that counsel's performance was deficient requires demonstrating that

3   counsel made errors so serious that counsel was not functioning as the "counsel"

4   guaranteed by the Sixth Amendment.  *See Strickland*, 466 U.S. at 687.  The defendant

5   must show that counsel's representation fell below an objective standard of

6   reasonableness.  *See id.* at 688.  Judicial scrutiny of counsel's performance must be highly

7   deferential, and a court must indulge a strong presumption that counsel's conduct falls

8   within the wide range of reasonable professional assistance.  *See id.* at 689.  The United

9   States Supreme Court recently reaffirmed that

10          [a]lthough courts may not indulge *post hoc* rationalizations for counsel's
            decisionmaking that contradicts the available evidence of counsel's actions, .
11          . . neither may they insist counsel confirm every aspect of the strategic basis
            for his or her actions.  There is a strong presumption that counsel's attention
12          to certain issues to the exclusion of others reflects trial tactics rather than
            sheer neglect.
13
    *Harrington*, 131 S. Ct. at 789.
14
15      Second, the defendant must show that counsel's errors were so serious as to

16  deprive the defendant of a fair trial, a trial whose result is reliable.  *Strickland*, 466 U.S. at

    688.  The test for prejudice is not outcome-determinative, i.e., defendant need not show
17
    that the deficient conduct more likely than not altered the outcome of the case; however, a
18
    simple showing that the defense was impaired is also not sufficient.  *Id.* at 693.  The
19
20  defendant must show that there is a reasonable probability that, but for counsel's

21  unprofessional errors, the result of the proceeding would have been different; a reasonable

    probability is a probability sufficient to undermine confidence in the outcome.  *Id.* at 694.
22
    Where the defendant is challenging his conviction, the appropriate question is "whether
23
    there is a reasonable probability that, absent the errors, the factfinder would have had a
24
    reasonable doubt respecting guilt."  *Id.* at 695.
25
26      If the state's case is weak, the potential prejudicial effect of counsel's performance

27  must be evaluated in light of that fact.  *See Johnson v. Baldwin*, 114 F.3d 835, 838 (9th Cir.

    1997).  After all, if the state's case is weak there is a greater likelihood of a reasonable
28

29

United States District Court

For the Northern District of California

probability that the result of the trial would have been different.  *See id.* at 839-40.

### a.   Failure to Investigate

A defense attorney has a general duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  *See Strickland*, 466 U.S. at 691; *Pinholster*, 131 S. Ct. at 1407.  *Strickland* directs that "'a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'"  *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 491).  Counsel need not pursue an investigation that would be fruitless or might be harmful to the defense.  *See Richter*, 131 S. Ct. at 789-90.  Assuming counsel should have found and presented additional evidence, a state court's rejection of a claim of ineffective assistance based on counsel's failure to pursue further investigation is reasonable if the additional evidence would not likely have caused the jury to reach a different verdict.  *See Samayoa v. Ayers*, 2011 WL 1226375 at *10-11 (9th Cir. Apr. 4, 2011) (affirming state court's rejection of claim of ineffective assistance where no reasonable probability of different outcome for penalty phase of capital trial given that additional mitigating evidence counsel failed to present about petitioner's difficult childhood does not outweigh overwhelming aggravating evidence).

A claim of negligence in conducting the pretrial investigation can form the basis for a claim of ineffective assistance.  *See United States v. Tucker*, 716 F.2d 576 (9th Cir. 1983).  Counsel must, at a minimum, conduct a reasonable investigation enabling her to make informed decisions about how best to represent her client.  *Avila v. Galaza*, 297 F.3d 911, 924 (9th Cir. 2002) (failure to conduct reasonable investigation, despite virtual certainty that defendant did not commit the crime, constituted deficient performance); *Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9th Cir. 1994) (failure to investigate leading to uninformed decision not to call witness who had admitted to committing crime not a strategic decision).

The duty to investigate and prepare a defense does not require that every

**United States District Court**
For the Northern District of California

1  conceivable witness be interviewed. *Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th Cir.

2  1995). A claim of failure to interview a witness cannot establish ineffective assistance

3  when the person's account is otherwise fairly known to defense counsel. *Eggleston v.*

4  *United States*, 798 F.2d 374, 376 (9th Cir. 1986). When the record shows that the lawyer

5  was well-informed and the defendant fails to state what additional information would be

6  gained by the discovery he now claims was necessary, an ineffective assistance claim fails.

7  *Id.* However, defense counsel's failure to pursue corroborating evidence through an

8  adequate pretrial investigation can establish constitutionally deficient performance.

9  *Hendricks*, 70 F.3d at 1040.

10         To establish prejudice caused by the failure to call a witness, a petitioner must show

11  that the witness was likely to have been available to testify, that the witness would have

12  given the proffered testimony, and that the witness' testimony created a reasonable

13  probability that the jury would have reached a verdict more favorable to the petitioner.

14  *Alcala v. Woodfora*, 334 F.3d 862, 872-73 (9th Cir. 2003).

15               **b.    Trial Tactics**

16         Tactical decisions of trial counsel deserve deference when: (1) counsel in fact bases

17  trial conduct on strategic considerations; (2) counsel makes an informed decision based

18  upon investigation; and (3) the decision appears reasonable under the circumstances. *See*

19  *Sanders*, 21 F.3d at 1456. Whether counsel's actions were indeed tactical is a question of

20  fact considered under 28 U.S.C. § 2254(d)(2); whether those actions were reasonable is a

21  question of law considered under 28 U.S.C. § 2254(d)(1). *Edwards v. LaMarque*, 475 F.3d

22  1121, 1126 (9th Cir. 2007).

23         The investigation itself must be reasonable for an attorney's tactical decision based

24  on that investigation to be reasonable. *Wiggins v. Smith*, 539 U.S. 510, 523-24 (2003)

25  (tactical decision not to present life history as mitigating evidence in capital sentencing trial

26  unreasonable where counsel failed to follow up on evidence that defendant had a

27  miserable childhood). However, federal courts should not overlook the "wide latitude

28

**United States District Court**

For the Northern District of California

1  counsel must have in making tactical decisions;" therefore, there are no "strict rules" for

2  counsel's conduct "[b]eyond the general requirement of reasonableness."  *Pinholster*, 131

3  S. Ct. at 1406-07 ("No particular set of detailed rules for counsel's conduct can satisfactorily

4  take account of the variety of circumstances faced by defense counsel or the range of

5  legitimate decisions . . . .") (quoting *Strickland*, 466 U.S. at 688-89).  A court must consider

6  not only the quantum of evidence known to counsel, but also whether the known evidence

7  would lead a reasonable attorney to investigate further.  *Wiggins*, 539 U.S. at 526-27; *see*

8  *also Pinholster*, 131 S. Ct. at 1407 (counsel not deficient in failing to further investigate and

9  present mitigating evidence of petitioner's mental disorder and negative family history in

10  capital sentencing trial because it was "reasonable for attorneys to conclude that creating

11  sympathy for the defendant's *family* is a better idea because the defendant himself is

12  simply unsympathetic").

13       Evidence that the challenged trial conduct resulted from inattention rather than from

14  strategic considerations may also be relevant to the inquiry.  *Wiggins*, 539 U.S. at 524-25

15  (noting that counsel represented to the court and to the jury in opening statements that they

16  would present a mitigation case based on defendant's difficult life; failure to present such

17  evidence, therefore, likely resulted from inattention rather than strategic decision).  *see also*

18  *Rompilla v. Beard*, 545 U.S. 374, 380-92 (2005) (even when a capital defendant's family

19  members and the defendant himself suggested that no mitigating evidence was available,

20  his lawyer was bound to make reasonable efforts to obtain and review material that counsel

21  knew the prosecution would probably rely on as evidence of aggravation at the trial's

22  sentencing phase); *Siripongs v. Calderon*, 133 F.3d 732, 734 (9th Cir. 1998) (court

23  evaluates failure to investigate or produce evidence for "strategic reasonableness").

24  Evaluation of the two duties overlaps: counsel cannot satisfy the duty to select a defense

25  when counsel does not investigate the best defense, but counsel may fail to investigate a

26  particular defense and still present the best one.  *Mickey v. Ayers*, 606 F.3d 1223, 1236-37

27  (9th Cir. 2010).

28

**United States District Court**

For the Northern District of California

To determine prejudice in a case where counsel failed to make a reasonable investigation to support a tactical decision, the Supreme Court considered whether a reasonable attorney would have made a different tactical decision if he had conducted a reasonable investigation, and whether there was a reasonable probability that the jury would have reached a different verdict had the attorney pursued the alternative strategy. *Wiggins*, 539 U.S. at 536-38.  In making the latter determination, a reviewing court must evaluate the totality of the evidence.  *Id.; see, e.g., Rompilla*, 545 U.S. at 389-92 (where state court never reached prejudice element of *Strickland* claim, Court examined element de novo and concluded that counsel's failure to examine defendant's prior conviction file was prejudicial to penalty phase of capital trial because examination of file would have uncovered a range of mitigation leads which, taken as a whole, might well have influenced the jury's appraisal of defendant's culpability).

### 2.   Rodriguez is Entitled to Relief on his Ineffective Assistance of Counsel Claim as it Pertains to Alberty, Jackson, and Ramsey

At the outset, the court makes two important observations.  First, the court notes that none of the state courts - in either round of state habeas review - articulated their rationale for their denial of Rodriguez's ineffective assistance of counsel claim, but instead simply issued summary or postcard denials.  Accordingly, this court is required to conduct an independent review of the record and the relevant federal law to determine whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law."  *See Delgado*, 223 F.3d at 981-82.

Second, the court notes that there is no explanation from trial counsel herself in the record before this court or before the state courts regarding the reasons, if any, underlying her failure to investigate or introduce evidence at trial.  In her May 24, 2003 declaration submitted to the state courts in conjunction with Rodriguez's petitions for habeas relief - part of the record before this court - Rodriguez's state appellate counsel, Sandra Gillies, notes that she sent trial counsel a declaration to sign, but that trial counsel failed to return the declaration.  Accordingly, given the absence of any such declaration from trial counsel,

United States District Court

For the Northern District of California

1    there is very little, if anything, in the record regarding her reasons and/or trial strategy.[8]

2                    **a.    Lyons and Caufield**

3         The court concludes that Rodriguez has not demonstrated that trial counsel's

4    performance was deficient when she chose to cease efforts to subpoena, and thus pursue

5    trial testimony from Lyons and Caufield, given that neither Lyons nor Caufield were

6    available to testify at trial.  Foskett believed that Lyons was trying to evade service, and

7    Caufield was hospitalized.  However, even if Weaver's performance could be considered

8    deficient with respect to these two witnesses, the court nevertheless concludes that

9    Rodriguez is unable to demonstrate prejudice with respect to Lyons and Caufield.

10        Neither Caufield nor Lyons offered testimony as helpful or specific as the other

11   witnesses at issue here.  Lyons' role or placement at the scene is difficult to comprehend,

12   and he is not mentioned by any other witness in this case.  The only time the record

13   reflects his existence is in the interview report prepared by Foskett.

14        Likewise, Caufield's testimony is difficult to understand.  Her interview report is fairly

15   vague.  She states that at least one member of the fighting groups was armed, but she was

16   unaware of the identities of any of the involved parties.  Therefore, it is almost impossible to

17   ascertain from her interview report who she believed were the aggressors, who was armed,

18   or other facts significant to Rodriguez's defense.  Additionally, neither Lyons nor Caufield

19   communicated with Rodriguez prior to the shooting their belief that the Walker group was

20   armed.

21        In sum, the main purpose of having these two witnesses testify would have been to

22   corroborate the defense witnesses' account of the robbery and the events leading up to the

23   shooting.  Rodriguez, however, has not sufficiently shown that Lyons and Caufield would

24   ───────────────

25   [8]It is this court's experience that in the state record the court receives in conjunction with
     the federal habeas proceedings, trial counsel routinely provide declarations reflecting their trial
26   strategy, in support of or even in opposition to, habeas petitions raising ineffective assistance
     of counsel claims.  There is often no means of assessing tactical decisions and the court finds
27   them very helpful in resolving these claims.  Unfortunately, here, trial counsel chose not to
     supply a declaration even when asked to do so, and the court is left to essentially guess as to
28   her trial strategy, if any.

                                              34

**United States District Court**

For the Northern District of California

1   have given the proffered testimony or that there is a reasonable probability that the jury

2   would have reached a verdict more favorable to him had they testified at trial.  For these

3   reasons, his federal habeas claim fails to the extent it is based on the failure to present

4   these two witnesses.

5              **b.      Jackson and Alberty**

6              As noted, the record simply does not reflect any effort by the defense to contact and

7   interview Alberty and/or Jackson prior to trial.  This is in spite of the fact that it may be

8   inferred that the defense was aware of their existence because both defense witnesses,

9   Breshell and Rodriguez, referred to Alberty and Jackson in their testimony at trial.  In fact,

10  both Alberty and Jackson attest in their declarations that they were never contacted by or

11  talked to the police or the defense about Rodriguez's case prior to his trial.

12             The court finds it extremely problematic that defense counsel never even identified,

13  much less interviewed Alberty and Jackson, or secured their testimony for trial.  Alberty and

14  Jackson were not tangential participants in the shooting; rather, they were intricately

15  involved in the entire altercation between the Walker and Melrose groups prior to the

16  shooting.  Their interviews represent exactly the type of corroborative investigation that

17  reasonably competent counsel would conduct.  *See Tucker*, 716 F.2d at 594.

18             Moreover, it appears that counsel's failure to present their testimony resulted not

19  from a strategic decision but from inattention.  *See Avila*, 297 F.3d at 920 (holding that

20  failure to present certain witnesses' testimony is not a valid strategic decision when

21  attorney never investigated witnesses' background or what testimony they could provide).

22  The lack of record evidence regarding a strategic choice by counsel *not* to present

23  evidence from Alberty and Jackson distinguishes this case from the United States Supreme

24  Court's recent decision in *Pinholster.  See* 131 S. Ct. at 1404 (noting that record supported

25  fact that death penalty petitioner's counsel acted strategically in presenting "family

26  sympathy" mitigation defense); *see also Richter*, 131 S. Ct. at 789-90.

27             Accordingly, the court finds that counsel's performance was deficient under the first

28

                                        35

United States District Court

For the Northern District of California

1   prong of the *Strickland* analysis when she failed to investigate Jackson and Alberty, thus

2   precluding introduction of their testimony at Rodriguez's trial.

3        Additionally, the court concludes based on the totality of the evidence, that there is a

4   reasonable probability that the jury would have reached a different result had Jackson and

5   Alberty testified. Testimony from Alberty and Jackson would have supported defense

6   witness Breshell's testimony about the general danger and aggressiveness posed by the

7   Walker group.  This corroboration was particularly important since the prosecution tried to

8   discredit Breshell throughout the trial.  If Rodriguez was going to successfully argue

9   justified use of deadly force as a defense, he needed more than Breshell's and his own

10  testimony.

11       Testimony from Jackson and Alberty would have undoubtedly added weight to

12  Breshell's explanation of the threatening situation.  Jackson and Alberty's accounts were

13  fairly consistent with one another and with the other testimony presented.  If Jackson and

14  Alberty had testified, it is unlikely that inconsistencies in their testimony would have acted to

15  discredit their perception of the incident because the inconsistencies between their

16  testimony were minor and their testimony was broadly consistent with the facts as

17  introduced at trial.

18       Additionally, in concluding that Rodriguez has demonstrated prejudice, the court

19  notes that the prosecution's case was relatively weak regarding whether the use of deadly

20  force was justified.  Neither prosecution witness Salazar nor Marshall actually observed the

21  crucial few minutes immediately preceding the shooting.  Marshall initially looked out his

22  window when he heard loud conversation but turned away from the window and went about

23  his business when he did not see a fight.  Marshall only went back to his window "five

24  minutes, give or take" later when he heard gunshots.  Similarly, Salazar saw the Walker

25  group when they first arrived on Melrose Avenue because Salazar was in his vehicle in the

26  street.  However, he then entered his house and told his wife to gather the kids from the

27  backyard because the unfamiliar teenagers made him nervous.  After entering his house,

28

36

United States District Court

For the Northern District of California

1   Salazar did not look outside his kitchen window to see what was happening in the street

2   until "about three to four minutes" later when he heard gunshots.

3        Although it is difficult for the court to make any definitive determination about

4   whether Alberty and Jackson would have been available to testify at trial had defense

5   counsel identified and contacted them, the court concludes that based on the absence of

6   an explanation in the record otherwise, including any evidence they were evading service,

7   any issue regarding their availability should be resolved in Rodriguez's favor, given his

8   successful showing on the other two elements of prejudice.

9        For these reasons, the court concludes that Rodriguez is entitled to habeas relief

10   based on his counsel's failure to investigate and introduce testimony from Alberty and

11   Jackson.

12                 **c.      Ramsey**

13       Rodriguez essentially claims that Weaver's performance regarding Ramsey was

14   deficient in two respects:  (1) she failed to attempt to subpoena Ramsey for trial in a timely

15   manner, and she should not have ceased defense efforts to locate Ramsey and secure his

16   trial testimony; and (2) in the absence of live testimony from Ramsey, counsel should have

17   attempted to introduce his preliminary hearing testimony at trial.

18                 **i.      Sub-Claim One: Failure To Timely Subpoena Ramsey**

19       This sub-claim is a close call, but the court ultimately concludes that Rodriguez is

20   unable to demonstrate deficient performance or prejudice.  It is unlikely that trial counsel's

21   failure to successfully subpoena Ramsey constituted deficient performance in light of the

22   fact that Ramsey was evading service.  The deficiency in defense counsel's performance

23   with respect to Ramsey instead appears to have stemmed from her failure to utilize at trial

24   the evidence available to her – Ramsey's preliminary hearing testimony.

25       Rodriguez is likewise unable to demonstrate prejudice because he cannot show that

26   Ramsey would have been available to testify.  Ramsey was actively avoiding service; thus,

27   there was no guarantee that Foskett could have located Ramsey even if defense counsel

28

1 had provided him with additional time and/or had not instructed him to cease his efforts to

2 locate Ramsey.

### ii.    Sub-Claim Two: Failure to Introduce Ramsey's Preliminary Hearing Testimony

3

4        Unlike witnesses Alberty and Jackson discussed above, trial counsel appears to

5 have made a tactical decision not to introduce Ramsey's preliminary hearing testimony.

6 She apparently read the testimony and decided that it was "too thin." However, the court

7 finds the circumstances here distinguishable from the Supreme Court's recent decisions in

8 *Pinholster* and *Richter*. *Pinholster*, 131 S. Ct. at 1404; *Richter*, 131 S. Ct. at 789-90.

9 Unlike counsel in those cases, trial counsel's tactical decision here is *not* entitled to

10 deference because it was not reasonable under the circumstances. If counsel had

11 introduced *any* evidence supporting Rodriguez's assertion that members of the Melrose

12 group had in fact been robbed by the Walker group, it would be a different story. However,

13 she did not introduce any such evidence, and Rodriguez's own testimony to that effect was

14 not admitted for the truth. Thus, the prosecution was able to argue - and did argue during

15 closing arguments - that there was absolutely no evidence that a robbery had occurred,

16 thereby undermining Rodriguez's defense that he justifiably used deadly force to prevent

17 Walker from robbing his friends.

18        Trial counsel's failure to seek to introduce any corroborating evidence that Ramsey

19 had been robbed and that Ramsey had communicated this information to Rodriguez prior

20 to the shooting left a huge hole Rodriguez's defense. Accordingly, Rodriguez has shown

21 deficient performance under the first prong of the *Strickland* analysis for this sub-claim

22 regarding Ramsey.

23        The court also concludes that counsel's failure to introduce Ramsey's preliminary

24 hearing testimony was prejudicial. This is in large part based again on the weakness of the

25 prosecution's case. The record reveals that the prosecution presented no real motive for

26 the murder in this case. Given the absence of any motive, it was essential that the defense

27 present evidence regarding the robberies that were alleged to have been committed by the

28

United States District Court

For the Northern District of California

1    Walker group, and which provided Rodriguez's explanation for the shooting.

2          There is a reasonable probability that the introduction of Ramsey's preliminary

3    hearing testimony would have impacted the jury's verdict in this case.  Ramsey arguably

4    constituted the most consequential witness because he was the only person involved in the

5    altercation between the Walker group and the Melrose group to have communicated

6    directly with Rodriguez prior to the shooting.  Therefore, only Ramsey's testimony (in

7    conjunction with Rodriguez's) could establish what information was available to Rodriguez

8    when Rodriguez allegedly formed the belief that the use of deadly force was justified.

9    Ramsey's preliminary hearing testimony would have provided the jury with evidence that

10   the Walker group robbed Ramsey, and that Ramsey advised Rodriguez that he had been

11   robbed.  Such testimony would thus have forced the prosecution to focus more on the

12   events preceding the shooting rather than the shooting itself.

13         Without Ramsey's testimony, the defense had no corroborating evidence or

14   testimony that a robbery had occurred and that such information had been communicated

15   to Rodriguez prior to the shooting.  This lack of corroborating evidence, coupled with the

16   relative weakness of the prosecution's case, supports the court's determination that the

17   deficient performance was prejudicial.  *See Johnson*, 114 F.3d at 838.

18         For these reasons, the court concludes that Rodriguez is entitled to habeas relief

19   based on his counsel's failure to introduce, or at a minimum, attempt to introduce Ramsey's

20   preliminary hearing testimony.

21   ////

22   ////

23   ////

24   ////

25   ////

26   ////

27   ////

28

                                                      39

United States District Court

For the Northern District of California

**CONCLUSION**

For the above reasons, the court GRANTS habeas relief on Rodriguez's ineffective assistance of counsel claim.  Accordingly, Rodriguez's conviction is VACATED.  The respondent shall release petitioner from custody unless the state commences proceedings to retry petitioner within one hundred and twenty (120) days of the date of entry of judgment on this order.  The clerk shall send an informational copy of this order to the district attorney of Alameda County, in addition to the usual service on counsel of record.

**IT IS SO ORDERED.**

Dated: June 1, 2011

_____
PHYLLIS J. HAMILTON
United States District Judge