United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SALVADOR A. RODRIGUEZ,

Petitioner,

v.

DERRAL ADAMS, Warden,

Respondent.

Case No. 04-cv-02233-PJH

**ORDER DENYING MOTION TO EXCUSE PROCEDURAL DEFAULT AND ISSUING CERTIFICATE OF APPEALABILITY**

Before the court is the motion of petitioner Salvador A. Rodriguez to excuse procedural default pursuant to *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). Respondent Derral Adams has filed an opposition, and Rodriguez did not file a reply. The matter is suitable for decision without oral argument and submitted on the briefs. Having carefully considered the relevant authority, the papers, and the evidence in the record, the court DENIES the *Martinez* motion.

**BACKGROUND**

The following summary of relevant facts and procedural history is taken primarily from the June 1, 2011 order granting habeas relief, the August 23, 2011 order granting in part respondent's motion to alter judgment and setting an evidentiary hearing, and the February 24, 2012 order denying habeas relief following evidentiary hearing. Given the lengthy history of the proceedings, the court finds it useful to restate the factual and procedural background here.

United States District Court
Northern District of California

**A. Factual Summary**

On the evening of March 3, 1998, in Oakland, California, Rodriguez shot and killed Frederick Walker ("Walker"). Prior to the shooting, a group of neighborhood youths including Roy Ramsey, Vonree Alberty, Kenneth Jackson, Thurston Breshell, Marcus Hawkins, and Albert Bagwell (referred to collectively as the "Melrose group") were hanging out in and around a car (the "Jackson-Alberty car") on the 4700 block of Melrose Avenue, also the block on which Rodriguez lived, near Hawkins' house. Shortly before 6:00 p.m., a station wagon with approximately nine or ten African-American teenagers[1] (the "Walker group" or "Walker car") drove down Melrose Avenue, from 47th to 48th Avenues and made a u-turn on 48th Avenue. The teenagers in the Walker group were not from the neighborhood. Among others, the Walker group included the driver, Damon Brown; Brown's cousin, Ferrari Johnson; the victim, Frederick Walker; and the victim's brother, David Walker.

The Walker station wagon first parked near a stop sign on 48th Avenue. The occupants of the Walker car then exited the vehicle and approached the Melrose group. After the Walker group converged on the Melrose group, the groups then split. Ramsey, a member of the Melrose group, walked down the street and was subsequently surrounded by members of the Walker group. Breshell, Alberty, and Jackson, other members of the Melrose group, remained in or around the Jackson-Alberty car and were also approached by members of the Walker group.

The timing of the subsequent events is a bit unclear. Members of the Walker group "relieved" Ramsey of three dime bags of marijuana.[2] Around the same time, a member of the Walker group went back to their station wagon, and pulled it alongside,

---

[1] Witnesses gave varying numbers, and it was never established exactly how many people comprised the Walker group.

[2] Ramsey testified at a preliminary hearing that he was robbed, but the prosecution argued at trial that there was no admissible evidence that a robbery occurred, based largely on the fact that the defense did not call Ramsey to testify at trial.

apparently double-parking next to the Jackson-Alberty car. Two members of the Walker group then began hassling Breshell.

After the Walker group took the marijuana from Ramsey, Ramsey walked across the street to Rodriguez's house, and went up to Rodriguez, who had exited his house after hearing loud noises. Ramsey told Rodriguez that he had just been robbed by the Walker group. At this point, Rodriguez observed a tussle between Breshell and members of the Walker group. Ramsey subsequently gave Rodriguez a gun, and Rodriguez then shot up in the air several times in an attempt to scare away the Walker group. One of these shots hit the victim, Walker, in the head and killed him.

On July 8, 1998, Rodriguez was charged with murder under California Penal Code § 187, along with enhancements that during the commission of the murder, he intentionally discharged a firearm and proximately caused death under California Penal Code § 12022.53(d); that he used a firearm under California Penal Code §§ 1203.06 and 12022.5; and that he inflicted great bodily injury under California Penal Code § 1203.075.

## B. Trial Proceedings

### 1. Prosecution Key Witnesses

#### a. Jewel Marshall

The prosecution called Jewel Marshall, a neighbor of Rodriguez who lived on Melrose Avenue. Marshall testified that he was at home on the evening of the shooting, and that after hearing loud voices outside, he looked out of his front window to see what was going on. Marshall testified that he observed at least two African-American teenagers standing near a station wagon parked in front of his driveway in the street, and that he saw another group of teenagers standing by the stairs to his neighbor Marcus Hawkins' house, including Hawkins, Bagwell, and Ramsey.

When Marshall first looked out the window, he testified that there did not seem to be a fight or an altercation between the two groups of people, and he did not see any weapons, so he left his window and went about his business. However, he subsequently heard gunshots and then went back to his window. While he was away from the window,

Marshall could still hear that there was a conversation outside, but reported that the tone subsequently increased in urgency.

When he went back to the window after hearing the shots, he saw the teenagers that had been surrounding the Walker station wagon run away at the sound of the gunfire. Marshall testified that he observed Rodriguez shooting the gun. Marshall also observed one of the fleeing teenagers fall to the ground in the street. After the shooting, Marshall witnessed a fist fight break out among the Walker group and the Melrose group.

**b. Armando Salazar**

The prosecution also called Armando Salazar, another Melrose Avenue resident, and a neighbor of Rodriguez's. Salazar arrived home at 5:45 p.m. on March 3, 1998. While he was still in his vehicle in front of his house, he noticed the Walker group's station wagon parked in front of his neighbor and prosecution witness, Marshall's house, and he subsequently saw nine or ten African-American teenagers jump out of the station wagon. At that point, Salazar entered his home because he had never seen the teenagers before, and told his wife to collect their kids from the backyard because the strange teenagers in the street made him nervous. However, Salazar testified that the teenagers were not fighting at that time.

When the Walker teenagers exited the station wagon, Salazar saw that one of them had a beer and another one urinated on a lawn. He testified that the teenagers were loud, but that he did not see any weapons on the Walker group, and that he did not observe the group fighting before the shots were fired. Salazar did not observe an altercation until he heard a gunshot three or four minutes later. At that point, he looked out of his kitchen window and observed Rodriguez holding a gun. When Rodriguez finished shooting, he turned and walked back into his house.

Salazar testified that he saw the teenagers run away when the shooting started. Subsequently, the members of the two teenage groups started fighting.

**c. Officer Morse**

Officer Morse participated in pulling over the Walker station wagon containing Walker group members Ferrari Johnson and Damion Brown after the shooting. He testified that the officers did not find a weapon in the Walker car.

**2. Defense Witnesses**

Rodriguez's defense was that he fired the gun to protect his friends from members of the Walker group, who were robbing them. Only Rodriguez and Breshell testified for the defense.

**a. Thurston Breshell**

Breshell testified that he was present on the 4700 block of Melrose Avenue at the time of the March 3, 1998 shooting. He attested that he and Ramsey were standing outside of a car occupied by Alberty and Jackson when they saw the Walker station wagon drive by.

Breshell testified that the car drove by slowly, and that he observed someone who appeared to be laying down suspiciously in the back seat of the car. Breshell then saw the Walker car make a u-turn on 48th Avenue and park near the stop sign at the corner. At that point, Breshell testified that five people got out of the station wagon, broke a wine bottle, talked to Hawkins, and approached the Melrose group. According to Breshell, their group then split: one group remained at the Jackson-Alberty car and the other group moved in front of Marshall's house.

Then, a member of the Walker group went back to their station wagon and pulled it "halfway on the side of the" Jackson-Alberty car. Breshell described the atmosphere as "hostile" when the Walker car pulled alongside the Jackson-Alberty car. After pulling to an abrupt stop, the driver of the Walker car exited the car and talked loudly to Breshell. At this point, Breshell saw Ramsey walking towards Rodriguez's house. Breshell did not see Ramsey get robbed.

The Walker group then grabbed Breshell and tried to get into his pockets. As Breshell was trying to fight off two members of the Walker group, Alberty and Jackson

drove away in their car. Breshell testified that he saw a third member of the Walker group, who might have been the victim, approach him, and also saw this person reach in his jacket for a gun. Breshell testified that he saw the handle of a gun tucked into the waistband of this person's pants. Breshell punched this approaching member of the Walker group before he could get the gun out of his pants.[3]

Breshell then heard a gunshot and ran away. He ran towards Rodriguez's house. The members of the Walker group who had been attacking Breshell then drove away in their station wagon. Breshell testified that he thought Rodriguez was protecting him (Breshell) when he fired the shots, including the one that hit Walker.

Breshell testified that he then went inside Rodriguez's house and was there when the police arrived. Breshell stated that he never talked to the police even though he had been personally involved in the altercation. He explained that the police make him nervous.

**b. Rodriguez**

Rodriguez testified that he was in his bedroom between 5:00 and 6:00 p.m. on March 3, 1998, when he heard loud noises from outside the house. He left his bedroom and his house, and walked down toward the street on Melrose Avenue to investigate.

When he got to the street, he saw "a lot of commotion." Rodriguez observed some people whom he recognized, including Breshell, Ramsey, Jackson, Hawkins, and Bagwell, and five other people that he did not recognize. He did not see any fighting when he first observed the large group of people.

Rodriguez testified that Ramsey crossed the street and approached him, as Rodriguez kept an eye on the altercation between the Melrose group and the Walker group. Rodriguez testified that Ramsey then told him that he had just been robbed.[4]

---

[3] The court notes that at trial, the prosecution emphatically argued that the Walker group had no guns or weapons.

[4] Because it was hearsay, the trial court admitted Rodriguez's testimony regarding what Ramsey told him not for the truth but to explain Rodriguez's state of mind, and the jury

United States District Court
Northern District of California

Rodriguez then observed the Walker group start to "go[] through [Breshell's] pockets," and saw Breshell struggling with the Walker group. Ramsey shouted to the Walker group to leave Breshell alone because Ramsey was the one with marijuana.

Rodriguez knew that Ramsey had a gun and asked Ramsey why he had not used it against the Walker group as they were robbing him. Rodriguez then told Ramsey to shoot the gun in the air to scare off the Walker group, but Ramsey instead pushed the gun into Rodriguez's hands. Rodriguez saw the Walker group crossing the street toward him, and he twice fired the gun into the air. Two teenagers retreated, but two continued to hassle Breshell. Rodriguez told the remaining two to "get off" Breshell, and when they did not, Rodriguez fired the gun three more times at approximately a twenty-degree angle.

Rodriguez conceded that he never observed a gun on any member of the Walker group, but nevertheless testified that he shot the gun to protect Breshell. He thought that the altercation between the Walker group and the Melrose group was "more than a fist fight."

**3. Prosecution Rebuttal**

In rebuttal, the prosecution called two officers to testify in order to call into question Breshell's credibility. Officer Bardsley, the officer who canvassed the neighborhood after the shooting to get statements from potential witnesses, testified that he entered Rodriguez's home to interview people at the residence and he did not observe any African-American males at that house. In other words, Bardsley did not see Breshell, who had earlier testified that he was present when the police came to Rodriguez's house.

**4. Closing Arguments**

During closing arguments, the prosecution conceded that the case "made no sense," and argued that the victim was dead because of "a senseless act." Although it did not offer a motive for the shooting, the prosecution emphasized that the shooting was

---

was given a limiting instruction to that effect.

not justified or excusable, nor did it constitute a crime committed in the heat of passion or a case of imperfect self-defense.

The defense, on the other hand, argued that the use of deadly force was justified because Rodriguez was defending Breshell, who was being robbed. In her closing argument, counsel argued that Rodriguez had just been told by Ramsey that Ramsey had been robbed right before he approached Rodriguez, immediately prior to Rodriguez personally observing his friend, Breshell, in an altercation with two members of the Walker group, who appeared to be robbing Breshell.

**5. Verdict and Post-Conviction Proceedings**

On January 20, 2000, an Alameda County Superior Court jury convicted Rodriguez of second degree murder with the use of a firearm to proximately cause death, but found the allegation of infliction of great bodily injury to be untrue. The trial court sentenced Rodriguez to state prison for a term of 40 years to life.

Rodriguez unsuccessfully appealed his conviction to the California Court of Appeal, and the California Supreme Court denied review on February 13, 2002.

Rodriguez subsequently filed a pro se state habeas petition with the Alameda County Superior Court, which the court denied. He then filed a habeas petition with the California Court of Appeal, and that court issued a postcard denial. On February 4, 2004, the California Supreme Court summarily denied Rodriguez's pro se petition for state habeas relief.

**C. Federal Habeas Proceedings**

On June 7, 2004, Rodriguez filed his original pro se habeas corpus petition under 28 U.S.C. § 2254. The handwritten petition appeared to include two grounds for relief: (1) a claim based on trial counsel's failure to investigate, and (2) a claim that the state trial court erred in giving a jury instruction. In addition to his handwritten petition, Rodriguez attached eight exhibits, A-H, which he had previously submitted to the California Supreme Court with his state habeas petition.

United States District Court
Northern District of California

On July 6, 2004, this court issued an order dismissing the petition with leave to amend, noting that it could not determine the nature of the claims from the petition. Subsequently, on August 11, 2004, the court received a letter from William Foskett ("Foskett"), an investigator who had previously been assigned to Rodriguez's case by the Alameda County Public Defender's office. As background, Foskett noted that he had worked as an officer for the Oakland Police Department for twenty years, subsequently worked as an investigator for the Alameda County Public Defender's Office, and later earned a law degree. Foskett's letter to the court detailed his concerns about the way Rodriguez's case had been handled by his trial counsel, Pauline Weaver. Foskett asked the court to pay special attention to Rodriguez's case, and requested that the court appoint counsel for him.

On October 26, 2004, the court issued an order granting an extension of time for Rodriguez to amend the original petition. The court noted that its prior order had been returned as undeliverable, and the clerk sent another copy of the prior July 6, 2004 order to the address previously supplied by Rodriguez. Additionally, the court asked that another copy be sent to Foskett to ensure that Rodriguez would receive it.

On November 1, 2004, in response to the order, Foskett sent another letter to the court providing an updated address for Rodriguez. Foskett also stated in the letter that Rodriguez did not have the intellectual capacity to prosecute his habeas case and again requested the court to appoint counsel for Rodriguez.

On November 24, 2004, Rodriguez, still pro se, filed an amended petition. In the amended petition, Rodriguez asserted that he was entitled to relief based on claims that:

(1) his counsel was ineffective in failing to hire an investigator to investigate the facts of his case, as detailed in a letter from Foskett;

(2) the trial court erred in giving incomplete instructions and in not giving him a copy of one of the instructions; and

(3) his trial counsel had a conflict of interest because Rodriguez had discharged her earlier in the case.

Rodriguez attached the same typewritten document that accompanied his original petition. Additionally, he included another letter from Foskett detailing the weaknesses that Foskett perceived in the defense's pretrial investigation of Rodriguez's case.

On December 12, 2004, the court issued an order to show cause requiring the state to respond to issues one and three, but dismissed the second issue regarding the jury instructions because it did not present a federal constitutional issue. On June 20, 2005, the state filed a motion to dismiss for failure to exhaust, in which it argued that one of the two remaining claims - that regarding Rodriguez's trial counsel's alleged conflict of interest - was unexhausted in state court. Therefore, the state argued that the case should be dismissed until Rodriguez exhausted the conflict of interest claim in state court.

Rather than opposing the state's motion to dismiss, Rodriguez sent the court two letters, one on August 25, 2005, and another on December 22, 2005, requesting a status report for his case. Additionally, on January 3, 2006, Foskett wrote another letter to the court on behalf of Rodriguez's mother requesting a status report.

Rodriguez ultimately failed to oppose the state's motion to dismiss, and on March 13, 2006, the court granted the state's motion to dismiss the conflict of interest claim as unexhausted with leave to amend. In light of Rodriguez's pro se status, the court carefully delineated Rodriguez's three options going forward, noting that he could: (1) voluntarily dismiss the case and exhaust the unexhausted claim in state court; (2) amend the petition to delete the unexhausted issue so that the court could proceed on the one exhausted issue; or (3) ask the court for a stay of the federal proceedings to afford him the opportunity to exhaust the second claim in state court.

On March 27, 2006, Rodriguez submitted a letter to the court requesting to amend his petition to remove the unexhausted claim regarding his trial counsel's alleged conflict of interest. In a March 30, 2006 order, the court treated Rodriguez's letter as an adequate amendment, deemed the petition amended, and directed the state to file an answer to Rodriguez's petition within sixty days. Accordingly, only the ineffective assistance of counsel claim remained.

After the state filed its answer and the state court record on May 2, 2006, Rodriguez filed a two-page handwritten response on June 8, 2006, that purported to be his traverse. In support, Rodriguez appended another letter from Foskett. Foskett had apparently reviewed the state's answer and drafted a letter to Rodriguez analyzing the state's arguments and advising him how to proceed. Rodriguez's traverse paraphrased Foskett's letter.

On May 28, 2006, Rodriguez filed a motion requesting the court to appoint him counsel. Rodriguez stated that he did not have the requisite legal knowledge to adequately proceed with his habeas petition. Subsequently, on January 26, 2007, the court received another letter from Foskett. This letter, similar to many of the previous letters, explained Foskett's role in the original investigation of the case and Foskett's opinions about the quality of the defense. Additionally, Foskett reiterated his belief that the court should appoint Rodriguez counsel.

On March 1, 2007, the court granted Rodriguez's request for appointment of counsel and stayed the habeas proceedings pending such appointment. On April 26, 2007, after counsel was appointed for Rodriguez, the court issued an order for supplemental briefing by Rodriguez, allowing newly appointed counsel to supplement the traverse that Rodriguez had previously filed pro se because the original traverse was inadequate.

On September 17, 2007, with the assistance of his appointed counsel, Rodriguez filed a supplemental traverse and a request for an evidentiary hearing. Rodriguez elaborated on his ineffective assistance of counsel claim, asserting that his trial counsel was ineffective for (1) failing to present testimony from witnesses who were located and interviewed by Investigator Foskett prior to trial, who he claimed would have supported his defense that the homicide was justified, including Roy Ramsey, Elaine Caufield, and Dennis Lyons; and (2) for failing to locate and investigate additional witnesses who were available and who would have testified that Rodriguez's role in the homicide was justified, including Kenneth Jackson and Vonree Alberty.

Rodriguez argued that the additional witnesses would have substantiated the defense's position that the victim and/or the victim's friends were committing a robbery or robberies at the time the victim was shot. Accordingly, Rodriguez contended that the additional witnesses would have supported his defense at trial that the homicide was justified in that he acted reasonably in the defense of another, or alternatively, that the evidence would have supported a conviction on the lesser-included offense of voluntary manslaughter by suggesting to the jury that Rodriguez acted honestly but unreasonably in the defense of another or in the heat of passion.

In support, Rodriguez attached six exhibits to his supplemental traverse, which were not previously a part of this court's record, nor were they a part of the record before the California Supreme Court. Those exhibits included: (1) a September 9, 2007 declaration from Scott Whitney; (2) a September 10, 2007 declaration from Vonree Alberty; (3) a September 16, 2007 declaration from Kenneth Jackson; (4) a May 3, 1999 interview report of Dennis Lyons; (5) a September 16, 2007 declaration from Foskett; and (6) a May 7, 1999 interview report for Elaine Caufield.[5]

On September 26, 2007, the court issued an order for further briefing and for additional documents from the state court record. The court noted that in his petition and the papers filed to date, Rodriguez had contended that he received ineffective assistance of counsel based on his trial counsel's failure to adequately investigate the facts of his case, a claim which had been detailed in Foskett's supporting letters. However, in his supplemental traverse, the court noted that Rodriguez argued as well that trial counsel's failure to present evidence at trial (including witnesses who had been interviewed) constituted ineffective assistance of counsel. In an effort to determine whether the issue, as framed by Rodriguez in his supplemental traverse, was exhausted before the state courts, the court ordered the state to submit the actual order from the California Court of Appeal and a copy of Rodriguez's February 7, 2003 state habeas petition. The court

[5] Caufield has since passed away.

further afforded the state the opportunity to respond to Rodriguez's supplemental traverse and request for an evidentiary hearing.

On November 11, 2007, the state filed another motion to dismiss Rodriguez's habeas petition as untimely and unexhausted. It argued that as framed by Rodriguez's supplemental traverse, his ineffective assistance of counsel claim was unexhausted, and that to the extent he sought to raise a new, unexhausted claim, it was untimely because it fell outside of the Antiterrorism and Effective Death Penalty Act's ("AEDPA") statute of limitations.

On March 4, 2008, following Rodriguez's opposition and the state's reply, the court stayed the federal habeas proceedings so that Rodriguez could return to state court to fully exhaust the claim. In concluding that a stay was appropriate, the court held that the new evidence and arguments presented by Rodriguez in his supplemental traverse, although related to his claim before the state court, placed his ineffective assistance of counsel claim in a significantly stronger evidentiary posture. Specifically, the court noted that only two witnesses testified at trial in support of Rodriguez's position that the victim was shot in the defense of others who were being robbed by the victim and the victim's friends at the time of the shooting - Rodriguez and Thurston Breshell. Four of the supplemental exhibits submitted to this court - the declarations and interview memoranda from Alberty, Jackson, Caufield, and Lyons - corroborated Rodriguez's and Breshell's testimony and provided additional details regarding the scene of the crime, including the alleged robberies, Rodriguez's conduct, and the conduct of the numerous other witnesses present that day. The court noted that those exhibits also corroborated the preliminary hearing testimony of Roy Ramsey, whose failure to testify at trial provided the underlying factual basis for Rodriguez's state court ineffective assistance of counsel claim.

Additionally, in granting the stay, the court noted that following exhaustion, Rodriguez would be permitted to amend his federal habeas petition to include the newly exhausted claim. In support, it concluded that because the claim contained in his pro se

amended federal petition and the claim detailed in his supplemental traverse were tied to a common core of operative facts, the exhausted claim would relate back to the timely-filed claim stated in Rodriguez's November 24, 2004 amended habeas petition.

Rodriguez subsequently presented the claim to the California Supreme Court, along with all of the additional exhibits that he filed with his supplemental traverse before this court. On July 15, 2009, the California Supreme Court summarily denied his habeas petition.

On July 24, 2009, this court reopened the case, and noted that the state had not previously had an opportunity to address Rodriguez's supplemental traverse on the merits. The court thus afforded the state an opportunity to file a supplemental opposition brief, and for Rodriguez to file a supplemental reply, which both parties did.

On June 1, 2011, the court granted Rodriguez's federal habeas petition as to claims pertaining to Jackson, Alberty, and Ramsey. First, regarding Jackson and Alberty, the court found that trial counsel's failure to contact and interview them prior to trial and to present their testimony constituted deficient performance, and was prejudicial pursuant to *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

Second, regarding Ramsey, the court concluded that trial counsel did not render deficient performance, nor could Rodriguez demonstrate prejudice, based on counsel's failure to timely locate and subpoena Ramsey and secure his trial testimony. However, the court held that counsel's failure to introduce Ramsey's preliminary hearing testimony constituted deficient performance, and that it was prejudicial because there was a reasonable probability that the introduction of Ramsey's preliminary hearing testimony would have impacted the jury's verdict.

On June 10, 2011, respondent filed a motion to alter judgment and a request for an evidentiary hearing. After briefing on the motion was complete, the court granted in part respondent's motion to alter judgment, vacated the judgment in favor of petitioner, and set an evidentiary hearing for the sole purpose of ascertaining Rodriguez's trial counsel's reasons for not seeking to introduce Ramsey's preliminary hearing testimony.

Doc. no. 76. In the order granting in part the motion to alter judgment, the court held that Rodriguez's claim of ineffective assistance of counsel with respect to Jackson and Alberty was procedurally barred, and that Rodriguez did not demonstrate cause for the procedural default.

Following an evidentiary hearing on February 17, 2012, the court entered an order denying Rodriguez's petition for writ of habeas corpus on the remaining claim of ineffective assistance of counsel based on trial counsel's failure to introduce witness Roy Ramsey's preliminary hearing testimony at trial. The trial attorney, Ms. Weaver, testified at the evidentiary hearing that she made a strategic decision not to introduce Ramsey's preliminary hearing testimony for several reasons:

> Most significantly, she testified that her decision was based on the likelihood that the prosecution would undoubtedly have highlighted how Ramsey's preliminary hearing testimony was both internally inconsistent with two other statements Ramsey provided to authorities, and also that collectively, portions of Ramsey's statements and prior testimony conflicted in several important respects with Rodriguez's own testimony. Additionally, Ms. Weaver noted that Ramsey was a close friend of Rodriguez's, and that she believed the jury was likely to question his credibility for that reason. Ms. Weaver also relied on the fact that other witnesses, including Thurston Breshell, whom Rodriguez was "protecting" at the time of the shooting, testified that the victim's group of friends was robbing Rodriguez's friends. Ms. Weaver further noted that she was also successful in introducing Ramsey's statement to Rodriguez that he had just been robbed as nonhearsay evidence to demonstrate the impact that the statement had on Rodriguez.
>
> Regarding the potentially damaging external inconsistencies, Ms. Weaver specifically noted that Ramsey's statements contradicted Rodriguez's testimony regarding how Rodriguez obtained the gun from Ramsey, and the direction in which Rodriguez aimed the gun, both of which were important factors with respect to Rodriguez's defense. In one of his statements, Ramsey asserted that Rodriguez "snatched" the gun from him, which flatly contradicted Rodriguez's testimony that Ramsey pushed the gun into Rodriguez's hands. Ramsey's Police Interview, Respondent's Evidentiary Hrg. Exh. A-2 at 2. In another statement, Ramsey stated that Rodriguez "starting shooting towards the cats that were out there after us," suggesting that Rodriguez shot in the direction of the victim's group. Ramsey's Police Interview, Respondent's Evidentiary Hrg. Exh. A-2 at 6. In contrast, Rodriguez testified that he twice fired the gun into the air, after

> which two teenagers retreated, but two continued to hassle Rodriguez's friend, Breshell. Rodriguez told the remaining two to "get off" Breshell, and when they did not, Rodriguez testified that he fired the gun three more times at approximately a twenty-degree angle.
>
> Ms. Weaver further testified that she discussed her decision not to introduce Ramsey's preliminary hearing testimony with a colleague of hers at the Alameda County Public Defender's office, and that her colleague agreed with her decision.

Doc. no. 84 at 4-5. The court found trial counsel's testimony regarding her strategic decision not to offer Ramsey's preliminary hearing testimony to be persuasive and credible. Accordingly, the court denied habeas relief on the remaining ineffective assistance of counsel claim.

Rodriguez appealed from the habeas denial. The court of appeals affirmed the judgment in part on the denial of the claim of ineffective assistance of trial counsel for failure to introduce Ramsey's preliminary hearing testimony, but reversed the judgment with respect to procedural default of the claim of ineffective assistance of trial counsel for failure to investigate and present testimony of Alberty and Jackson. Citing *Martinez v. Ryan,* 132 S. Ct. 1309 (2012), which the Supreme Court decided about one month after the court denied habeas relief, the Ninth Circuit held that "*Martinez* appears to offer Rodriguez a clear path for relief" from procedural default of the ineffective assistance of counsel claim alleging failure to investigate and present the testimony of Jackson and Alberty. *Rodriguez v. Adams,* No. 12-15485 (9th Cir. Nov. 18, 2013) ("slip op."). The claim of ineffective assistance of trial counsel with respect to Jackson and Alberty was remanded to consider whether Rodriguez can demonstrate cause under *Martinez*, in light of *Detrich v. Ryan*, 740 F.3d 1237 (9th Cir. 2013) (en banc), and whether Rodriguez can demonstrate prejudice under *Coleman v. Thompson*, 501 U.S. 722 (1991). Slip op. at 5.

## DISCUSSION

### I. Legal Standard

A state prisoner may obtain federal review of a procedurally defaulted claim by showing cause for the default and prejudice from a violation of federal law. *Martinez v.*

*Ryan*, 132 S. Ct. 1309, 1316 (2012).  In *Martinez v. Ryan*, the Supreme Court announced

an equitable rule by which cause may be found for excusing a procedurally defaulted

claim of ineffective assistance of trial counsel where a petitioner could not have raised

the claim on direct review and was afforded no counsel or only ineffective counsel on

state collateral review.

> [A] federal habeas court [may] find "cause," thereby excusing a defendant's procedural default, where (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law requires that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 133 S. Ct. 1911, 1918 (2013) (quoting *Martinez*, 132 S. Ct. at 1318-19,

1320-21).

## II.   Cause and Prejudice to Excuse Procedural Default Under *Martinez*

### A.   Whether Underlying IAC of Trial Counsel Claim is Substantial

In the order of remand, the Ninth Circuit determined that three of the four *Martinez*

factors for establishing cause were satisfied: Rodriguez lacked counsel during his state

collateral proceeding; that proceeding likely constituted an "initial-review proceeding;" and

California's "state procedural framework, by reason of its design and operation, makes it

highly unlikely in a typical case that a defendant will have a meaningful opportunity to

raise a claim of ineffective assistance of trial counsel on direct appeal."  Slip op. at 4-5

(citing *Trevino*, 133 S. Ct. at 1921).  The issue thus squarely in dispute is whether the

underlying ineffective assistance of trial counsel claim was "substantial."

Respondent contends that "lack of counsel" should not automatically satisfy the

requirements for cause under *Martinez*, in the absence of controlling authority finding that

lack of counsel in the state habeas proceeding satisfies the second *Martinez* requirement

that cause consist of there being "no counsel" or "ineffective counsel" during the state

collateral review proceeding.  Opp. at 4.  Respondent cites no authority for the

proposition that just as a represented defendant must show ineffective assistance of state habeas counsel to establish cause, "an unrepresented defendant likewise should be required to meet *some* standard" for reasonableness. Opp. at 6. In the order remanding the claim, the Ninth Circuit found that Rodriguez lacked counsel during his state collateral proceeding and found "this factor satisfied" under *Martinez*. Slip op. at 4 and n.1. Under the law of the case, the court does not further consider whether Rodriguez must satisfy a reasonableness standard as a pro se habeas petitioner to establish cause under *Martinez*.

**1. Whether Underlying IAC Claim Has Some Merit**

Rodriguez argues that the standard for an IAC claim to be "substantial" to satisfy the *Martinez* test for cause is equated with the standard for issuance of a certificate of appealability where a petitioner has made a "substantial showing of the denial of a constitutional right," that is, "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Doc. no. 101 at 2 (citing *Detrich*, 740 F.3d at 1245 (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003))). Respondent points out that the plurality view in *Detrich* that the "substantial" requirement for cause under *Martinez* requires only a showing whether "reasonable jurists" could debate the merits was not adopted by a majority of the en banc panel in *Detrich,* but respondent agrees that *Martinez* requires, at a minimum, that the underlying IAC claim have "some merit" and is "potentially legitimate." Opp. at 6-7 (citing *Martinez*, 132 S. Ct. at 1315, 1318). The parties agree that the Court in *Martinez* defined an "insubstantial" claim as one that "does not have any merit or [ ] is wholly without factual support." 132 S. Ct. at 1319.

"[A] district court may take evidence to the extent necessary to determine whether the petitioner's claim of ineffective assistance of trial counsel is substantial under *Martinez*." *Dickens v. Ryan*, 740 F.3d 1302, 1321 (9th Cir. 2014) (en banc). "To demonstrate that there was a reasonable probability that, absent the deficient

performance, the result of the post-conviction proceedings would have been different, it will generally be necessary to look through to what happened at the trial stage." *Clabourne v. Ryan,* 745 F.3d 362, 377-78 (9th Cir. 2014). The plurality opinion in *Detrich* noted that *Martinez* recognized that "determining whether there has been ineffective assistance of counsel often requires factual development in a collateral proceeding." *Detrich*, 740 F.3d at 1246.

**2. Evidentiary Support for Underlying Ineffective Assistance of Trial Counsel Claim**

Rodriguez contends that there is "no evidence in the record that trial counsel even considered interviewing Jackson and Alberty." Doc. no. 101 at 3. The record does, however, have the benefit of trial counsel's testimony regarding her trial strategy with respect to her decision not to introduce Ramsey's preliminary hearing statement. Trial counsel's strategic decisions were articulated at the evidentiary hearing that the court held after issuing its initial ruling granting habeas relief, which was vacated and superseded by the subsequent rulings on procedural default and denial of habeas relief.

In support of his *Martinez* motion, Rodriguez refers to the supplemental declarations by Jackson and Alberty that he submitted to the California Supreme Court with his 2008 state habeas petition.[6] Doc. no. 101 at 3. These declarations were the only evidence proffered in support of this IAC claim in the habeas petition, and Rodriguez proffers no additional evidence or supporting declarations now. Respondent does not challenge the admissibility of Alberty and Jackson's declarations for consideration on the present *Martinez* motion. Rodriguez contends that these declarations strongly support his defense-of-others trial defense and are "mostly consistent" with other evidence introduced at trial. *Id*. The court reviewed and summarized these declarations in the initial ruling granting the federal habeas petition. Although the court declined to consider these declarations upon determining that the ineffective assistance of trial counsel claim

[6] With respect to the instant *Martinez* motion, Rodriguez did not submit additional evidence, did not request an evidentiary hearing, and did not file a reply brief.

was procedurally defaulted, the court now weighs this evidence to determine whether that claim was "substantial" to support cause to excuse the procedural default. *See Detrich*, 740 F.3d at 1246. For purposes of determining cause, the court considers the proffered statements of Jackson and Alberty, as well as the testimony of trial counsel as to her trial tactics and strategic decisions with respect to witness testimony.

**a. Declaration of Vonree Alberty**

Alberty was present at the scene of the shooting. Scott Whitney, the investigator hired by Rodriguez's habeas counsel, obtained a statement from Alberty on September 10, 2007. Doc. no. 44-4, Ex. B (cited in June 1, 2011 Order as Exhibit BB).

> Alberty did not testify at trial and was not interviewed prior to trial.
>
> In his declaration, Alberty stated that he was hanging out on Melrose Avenue with Jackson and Breshell on the day of the shooting. Jackson and Alberty were in the car while Breshell stood next to the car on the sidewalk. Ramsey was on Melrose Avenue, but was not necessarily in or next to the car at the time.
>
> Alberty observed the Walker car drive by with approximately ten people in it. He lost sight of the car when it turned onto 48th Avenue. A little later, Alberty saw the same group of people walking down the sidewalk towards Jackson's car. Alberty thought that something was suspicious so he got out of the car. The two groups exchanged small talk, but the Walker group seemed to be acting suspiciously to Alberty.
>
> Alberty stated that Ramsey seemed to be avoiding the Walker group. After talking with Alberty for a bit, the Walker group then started to walk away. Alberty got back in the car with Jackson. However, the Walker group did not leave, but instead formed a huddle and began whispering to each other. The Walker group then split into several groups: two went to Jackson's side of the car, two went to Breshell, two were on the sidewalk behind Alberty's car door, and three or four more were somewhere behind the car. Hawkins, a member of the Melrose group, was also present at this point.
>
> The Walker group then aggressively questioned Jackson and Alberty about whether they had any drugs. Alberty stated that the Walker group was attempting to rob them. Alberty did not see any weapons, though. Alberty then saw Breshell start pushing and slapping the two guys surrounding him. Alberty was not sure whether they were fighting or whether the Walker group was trying to rob Breshell. Alberty, who had since gotten back into the car,

> then jumped out of the car again to help Breshell. He started fighting with the Walker group.
>
> Alberty heard four shots come from behind him. He believed these shots came from the Walker group. Alberty then heard another four shots come from a different direction, shot from a seemingly different caliber gun. Everyone dropped to the ground at the sound of the gunshots. When the shots stopped, Alberty stood up and noticed someone on the ground. He was laying in the area where Alberty believed the shots originated.
>
> The Walker car then pulled up, members of the Walker group got into the car, and the car left the scene. Similarly, Jackson and Alberty drove away from the scene.
>
> Alberty also recounted a threatening experience he had with the Walker group a few months after the shooting. Alberty was identified by members of the Walker group while he was at a store. The members of the Walker group then followed Alberty to his neighborhood. While Alberty hid in his sister's house, he saw the members of the Walker group searching the neighborhood for him. Alberty stated that he observed all of the members of the search group with guns.

June 1, 2011 Order at 21-22.

**b. Declaration of Kenneth Jackson**

Jackson was also present at the scene of the shooting. Whitney, the investigator hired by Rodriguez's habeas counsel, obtained a statement from Jackson on September 16, 2007. Doc. no. 44-6, Ex. C (cited in June 1, 2011 Order as Exhibit CC).

> Jackson did not testify at trial and like Alberty, he also was not interviewed by the defense prior to trial.
>
> In his declaration, Jackson stated that prior to the shooting, he was hanging out, sitting in his parked car on Melrose Avenue. Ramsey, Alberty, and Breshell were hanging out with him in and around the car. At some point, Ramsey moved down the street, Alberty got in the passenger side of Jackson's car, and Breshell remained next to the car.
>
> Jackson then saw a station wagon occupied by nine people, the Walker car, drive by. As they drove by, Jackson noticed that they looked at the Melrose group aggressively. The Walker car made a u-turn on 48th Avenue and parked near the corner. Hawkins, another member of the Melrose group, was close to the Walker group as they got out of their car at the corner.
>
> The Walker group started to approach the Melrose group. Five members of the Walker group surrounded Ramsey, two remained close to where they had parked their

> car, and two more approached Jackson's car. At this point, Jackson noticed that the members of the Walker group were carrying open bottles of alcohol, and that the two who were approaching Jackson's car briefly stopped to urinate on a lawn. The members of the Walker group who were not surrounding Ramsey appeared to Jackson to be acting as lookouts.
>
> In his car's rearview mirror, Jackson saw Ramsey giving the contents of his pockets to a member of the Walker group. Then, a member of the Walker group pulled the station wagon into the middle of the street and parked it behind Jackson's car. The driver got out of the station wagon and aggressively approached Jackson. Jackson stated that he understood this person's actions as an attempt to rob him.
>
> Jackson then heard Ramsey yell to the driver that Jackson didn't have any drugs and that the Walker group should leave Jackson alone. Apparently in response, the driver then approached Breshell instead. Other members of the Walker group who had previously been acting as lookouts also approached Breshell at this point. Breshell then punched the driver of the Walker group in the face.
>
> Jackson and Alberty began to exit the car to help Breshell. However, as soon as they got out of the car, Jackson heard a gunshot. Jackson ducked, got back in his car, and started the engine. Jackson then heard two more shots. Alberty got back in the car, and Jackson and Alberty drove away.
>
> Jackson stated that he did not see any guns on the Walker group.

June 1, 2011 Order at 22-23.

As respondent points out, neither Jackson nor Alberty stated that they were willing to testify at Rodriguez's trial in 1999. On the contrary, their declarations indicate that they were scared about being identified by the people involved in the shooting. Jackson described the incident as "the scariest day of my life." Doc. no. 44-6. Alberty stated that he never went back to his friend Roberto's house, where the shooting occurred, after the incident. Doc. no. 44-4. Alberty also stated that a few months after the shooting, he saw two guys from the shooting incident who seemed to recognize him at a store and then followed him to his sister's house, appearing to have guns and looking for Alberty, which made him nervous for months and years to come. Doc. no. 44-4. Alberty stated that no one from the legal system talked to him about the shooting, and that he was less

concerned now about being recognized because he and the other guys involved in the incident were grown and all look different. Doc. no. 44-4 ¶¶ 11-13. Unlike witness Ramsey who testified at the preliminary hearing, neither Jackson nor Alberty spoke to police or the defense investigator, or testified at the preliminary hearing. There is no evidence in the record to suggest that these witnesses would have come forward and/or cooperated with the defense at the time of trial. Even when considering the declarations provided by Jackson and Alberty nine years after the incident, it is purely speculative whether they would have testified on Rodriguez's behalf at trial or helped the defense.

**3. No Substantial Claim of Ineffective Assistance of Trial Counsel**

In order to show that his ineffective assistance of trial counsel claim was "substantial" under *Martinez*, Rodriguez must demonstrate that there is "some merit" to his claim that trial counsel's performance was deficient and that this deficient performance prejudiced the defense. To establish prejudice under *Strickland*, the petitioner must show a reasonable probability that but for counsel's failure to track down the witness, the result of the guilt phase would have been different. *Hurles v. Ryan*, 752 F.3d 768, 782 (9th Cir.) (citing *Strickland*, 466 U.S. at 694), *cert. denied*, 135 S. Ct. 710 (2014). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

In *Hurles*, the Ninth Circuit held that the petitioner failed to establish cause to excuse the procedural default of his ineffective assistance of trial counsel claim based on failure to investigate a witness who had intimate contact with the petitioner just hours before he committed murder. The court determined that the witness was not located by the habeas investigator and that the court could only speculate as to whether her testimony about the petitioner's behavior and mental state before the crime would have helped or undermined the petitioner's insanity defense. The court in *Hurles* held that the petitioner failed to establish the prejudice prong of his claim of ineffective assistance of trial counsel under *Strickland*, finding that the "claim of prejudice amounts to mere speculation," and therefore failed to establish cause to excuse procedural default of that

claim. 752 F.3d at 782 (citing *Cooks v. Spalding*, 660 F.2d 738, 740 (9th Cir. 1981)). With respect to the claim of ineffective assistance of appellate counsel, however, the *Hurles* court determined that the petitioner sufficiently demonstrated deficient performance and prejudice to establish cause to excuse the procedural default of that IAC claim. 752 F.3d at 783-84.

**a. *Strickland* Deficient Performance Prong**

Rodriguez relies on the court's earlier finding that, in the absence of any declaration from trial counsel regarding her failure to investigate or introduce Jackson or Alberty's testimony at trial, "there is very little, if anything, in the record regarding her reasons and/or trial strategy" and that "it appears that counsel's failure to present their testimony resulted not from a strategic decision but from inattention." June 1, 2011 Order at 34, 35. The court, however, subsequently vacated the holding that Rodriguez was entitled to habeas relief on his claim of ineffective assistance of trial counsel based on failure to investigate and introduce testimony from Alberty and Jackson, upon determining that the claim was procedurally barred. Aug. 23, 2011 Order at 6-7. The court now determines, based on the record as supplemented by trial counsel's testimony, that Rodriguez has not shown either deficient performance or a reasonable probability that, but for trial counsel's failure to interview, investigate or introduce testimony by Alberty or Jackson, the result of the proceeding would have been different.

In determining whether there is cause to excuse the procedural default, the court may rely on the record as supplemented by trial counsel's testimony at an evidentiary hearing held by the court on February 17, 2012. *See Dickens*, 740 F.3d at 1321. Trial counsel articulated her strategic reasons with regard to her decision not to introduce Ramsey's preliminary hearing testimony, including concerns whether the witness's statements would have corroborated, or conflicted with, Rodriguez's testimony, and trial counsel's determination that Breshell was a credible witness who testified that young men from the victim's group were trying to rob him and that one of them had a gun; that the testimony about the attempted robberies of both Ramsey and Breshell came in

through several witnesses to show their effect on Rodriguez and his state of mind; and that this evidence supported the defense of others theory at trial. Doc. no. 91 (Feb. 17, 2012 Transcript) ("Tr.") at 14, 19, 22-24, 26, 29.

Those strategic considerations establish that it was within the bounds of reasonable attorney performance not to call additional witnesses, such as Alberty and Jackson, to testify about the encounter leading up to the shooting. In particular, trial counsel explained why she thought that Thurston Breshell was a critical witness to establish that Breshell was being robbed and that Rodriguez was acting in defense of others:

> Mr. Breshell had no record at all, so he could take the stand without being impeached. The testimony about the robbery came in through several of the witnesses and through my client's statement, both on the stand and through Sergeant Holoman to whom he gave the statement.

Tr. at 19. Trial counsel recounted that Breshell testified that the young men involved in the incident were going through his pockets and attempting to rob him, which supported the theory of defense of others or "misguided" defense of others. Tr. at 26, 28. Breshell also testified that he saw a gun in the possession of one of the people coming towards him. Tr. at 41; Answer, Ex. 2 ("Trial Tr.") at 267. Trial counsel stated that Breshell's testimony corroborated Rodriguez's testimony that he believed he was protecting Breshell. Tr. at 14. With this evidence presented at trial, it was within the "wide range of reasonable professional assistance" for trial counsel not to interview or call additional witnesses to testify about the shooting incident and widen the possibility for inconsistencies or impeachment. *See Harrington v. Richter*, 562 U.S. 86, 104 (2011).

In light of the current record, the court's earlier finding, that "it appears that counsel's failure to present [Alberty and Jackson's] testimony resulted not from a strategic decision but from inattention," was erroneous in failing to attribute the presumption of adequate performance to which trial counsel was entitled under *Richter*, 562 U.S. at 109 (recognizing the "'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect'").

United States District Court
Northern District of California

*See* June 1, 2011 Order at 35. Trial counsel testified that she knew there were other percipient witnesses, based on Ramsey's preliminary hearing testimony. Tr. at 37. Although the court limited the scope of the evidentiary hearing to trial counsel's decision not to introduce Ramsey's testimony, it can be inferred from the record, including Breshell's trial testimony stating that he was with Jackson and Alberty, that trial counsel was aware that Jackson and Alberty were present at the time of the shooting. Trial counsel is entitled to a presumption of adequate performance, and the decision not to investigate or interview Jackson and Alberty fell within the wide range of reasonable assistance under the circumstances, given that the identity of the shooter was not at issue and that trial counsel planned to elicit testimony from other witnesses at trial to present evidence of Rodriguez's state of mind in support of the defense-of-others theory. *See Gentry v. Sinclair*, 705 F.3d 884, 900 (9th Cir. 2013) (because "counsel is strongly presumed to have rendered adequate assistance," even where trial counsel's affidavits did not address the specific IAC claim, it was not unreasonable for the state court to conclude that trial counsel's performance was not deficient when the petitioner had no evidence to indicate why the failure to present evidence of psychological condition was unreasonable under the circumstances) (citing *Strickland*, 466 U.S. at 690). *Cf. Avila v. Galaza*, 297 F.3d 911, 919 (9th Cir. 2002) (finding deficient performance where defendant denied that he was the shooter and defense counsel failed to investigate or introduce witnesses who told counsel that they saw the shooter); *Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9th Cir. 1994) (petitioner was denied effective assistance of counsel where defense counsel failed to investigate evidence of the "most important defense: that [the defendant's brother who was at the scene] was the shooter").

**b. *Strickland* Prejudice Prong**

Even if trial counsel performed below an objective standard of reasonableness by failing to contact, investigate and call Alberty and/or Jackson to testify at trial, Rodriguez fails to show prejudice from any such unprofessional error to establish a "substantial" IAC of trial counsel claim. *See Hurles*, 752 F.3d at 782. To the extent that the court's prior

rulings could be construed as a finding of a reasonable probability that, but for trial counsel's failure to interview or call Alberty and/or Jackson to testify, the trial outcome would have been different, those findings are vacated. In light of trial counsel's testimony about trial tactics and her strategic evaluations about the strength of the case, it is not reasonably probable that the proffered testimony of Alberty and Jackson would have affected the verdict.

First, the proffered testimony of Alberty and Jackson is cumulative of Breshell's trial testimony that he was being robbed in support of Rodriguez's defense-of-others theory. Tr. at 12-14, 26. Further, as trial counsel explained at the evidentiary hearing, both Rodriguez and Breshell testified not only about the attempted robbery on Breshell, but also that they heard Ramsey say that he was robbed, which was admitted for the effect on Rodriguez's state of mind. Tr. at 14-15, 29-30, 49-50. *See* Trial Tr. at 270. Trial counsel offered Breshell and Rodriguez's testimony, as well as the transcript of Rodriguez's statement to the police, as evidence to support either a perfect defense-of-others defense or an imperfect defense of others on the theory that Rodriguez shot the victim "in the actual but unreasonable belief in the necessity to defend another against imminent peril to life or great bodily injury." Answer, Ex. 1 (Clerk's Transcript) at 289-314 (jury instructions on first and second degree murder and voluntary manslaughter, and defining robbery as a forcible and atrocious crime which threatens life or great bodily injury). The proffered testimony of Alberty and Jackson would have been merely cumulative of Breshell's corroboration of Rodriguez's testimony, and does not support a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different.

Second, neither Alberty nor Jackson saw who fired the shots or where they came from, and could not, therefore, corroborate Rodriguez's account that he fired two warning shots in the air and then lowered the gun and fired additional shots at a slight angle toward the ground, but not aiming toward the victim's group. Tr. at 24. As trial counsel explained, despite what Rodriguez testified, there were two independent witnesses who

saw Rodriguez fire directly at the young men with his arm parallel to the ground, and the "most damaging" evidence in the case was how the bullet traveled and the coroner's preliminary hearing testimony "that the bullet entered the victim's ear and traveled straight through the brain at neither an up or down angle." Tr. at 11-12. At trial, the coroner testified that the bullet entered the victim's right ear, that the bullet caused perforating defects to the inside of the skull and to the brain, and that a bullet fragment was recovered from the left side of the victim's brain, underneath the left forehead. Trial Tr. at 138-39. The coroner determined from the bullet's path that the bullet "didn't really tend relative to the body either [to] go up or down," although there was no indication whether the victim was standing or bending down at the time he was shot. *Id.* at 138, 145. Jackson and Alberty's declarations do not rebut the evidence suggesting that Rodriguez fired directly at the Walker group and do not corroborate Rodriguez's account about the shooting. In particular, Alberty's statement that he thought Rodriguez ("Sal") was coming from the direction of his house to investigate after the shooting occurred contradicts Rodriguez's own admission that he fired the gun. *See* doc. no. 44-4 ¶ 10. Alberty's statements that he believed that someone from the victim's party fired the first round of four shots, and then he heard another set of four shots from a different caliber gun coming from a different direction were also inconsistent with defense testimony that Rodriguez fired two warning shots in the air before firing four additional shots angled downward. *See* doc. no. 44-4 ¶ 7.

Third, Rodriguez has not shown that the witnesses would have supported his defense that use of deadly force was justified, given Alberty's statement that he didn't see the victim's party (the Walker group) carry any weapons, and Jackson's statement that he did not know "if any of the guys who tried to rob us had guns." Doc. no. 44-4 ¶ 6; doc. no. 44-6 ¶ 14. After observing the Walker group moving in on Breshell, rather than fearing use of deadly force, Jackson felt prompted to "get out and fight" before hearing a gun shot and then squatting at the side of his car. Doc. no. 44-6 ¶¶ 12-13. By contrast, Breshell had testified that he saw a gun in the possession of one the people in the Walker

group coming toward him. Trial Tr. at 267. Neither Alberty nor Jackson would have been able to corroborate Breshell's testimony that at least one of the assailants was armed. Even Rodriguez himself admitted that he did not see a gun on any member of the Walker group. Trial Tr. at 315.

Finally, the declarations by Alberty and Jackson do not directly state or even suggest that they would have testified on behalf of the defense at the time of the trial; both witnesses indicate that they had nothing to do with the shooting and that they were scared by the incident, suggesting that they would not have come forward to testify.

Under Supreme Court authority, counsel is entitled to a presumption of effectiveness, even without direct evidence of her trial strategy with respect to the witnesses who were not interviewed or called to testify. *Burt v. Titlow*, 134 S. Ct. 10, 17-18 (2013) ("It should go without saying that the absence of evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.'") (citing *Strickland,* 466 U.S. at 689). *See Gentry v. Sinclair*, 705 F.3d 884, 900 (9th Cir. 2013) ("counsel is strongly presumed to have rendered adequate assistance") (citing *Strickland*, 466 U.S. at 690). In light of the record, including the evidentiary hearing conducted by the court, the declarations of Alberty and Jackson do not establish prejudice under *Strickland* to support a "substantial" claim of ineffective assistance of trial counsel. *Hurles,* 752 F.3d at 782. Rodriguez fails to show that there was a "substantial, not just conceivable" likelihood of a different result if the jury had considered such evidence. *Clark v. Arnold*, 769 F.3d 711, 728 (9th Cir. 2014) (citing *Richter*, 131 S. Ct. at 792).

### III. Prejudice Requirement Under *Martinez*

For purposes of determining on remand whether Rodriguez can demonstrate cause and prejudice to excuse procedural default, the court adopted the view expressed in Judge Fletcher's plurality opinion in *Detrich v. Ryan*, 740 F.3d 1237 (9th Cir. 2013) (en banc), *cert. denied*, 134 S. Ct. 2662 (2014), that "there is no need to show 'prejudice' resulting from the failure of the pro se prisoner during the state PCR proceeding to raise

a claim of trial-counsel IAC, over and above the need to satisfy the first *Martinez* requirement that the underlying trial-court IAC claim be 'substantial.'" *Detrich*, 740 F.3d at 1245 (9th Cir. 2013). *See also Clabourne,* 745 F.3d at 377-78 (noting the overlap between the requirements of cause and prejudice in that an element of prejudice must be established within the cause prong: "to show ineffective assistance of post-conviction relief counsel, a petitioner must establish a reasonable probability that the result of the postconviction proceeding would have been different"). As the court in *Clabourne* articulated, a majority of the en banc panel in *Detrich* did not adopt Judge Fletcher's plurality opinion that the prejudice prong is not required separately from showing cause under *Martinez*, but the majority of judges in *Detrich* concluded that "prejudice" requires only a showing that the trial-level ineffective assistance of counsel claim was "substantial." *Clabourne*, 745 F.3d at 377 (noting that the five dissenting judges in *Detrich* recognized that procedural default of an IAC claim may be excused under *Martinez* "if the petitioner establishes both (1) cause and (2) prejudice, by showing that the underlying claim of trial counsel's ineffectiveness is substantial, meaning that it has some merit") (citing *Detrich*, 740 F.3d at 1261) (Graber, J., dissenting)) (internal citation and quotation marks omitted). That is, "if the claim of ineffective assistance of trial counsel is implausible, then there could not be a reasonable probability that the result of post-conviction proceedings would have been different." *Id*. *See also Hurles*, 752 F.3d at 781 (to establish cause for the procedural default of an IAC claim, the petitioner must show that post-conviction counsel was ineffective in not raising a particular claim under both the deficient performance and prejudice prongs pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984), and that the underlying IAC claim is "substantial," meaning that it "has some merit") (citing *Martinez*, 132 S. Ct. at 1318).

Under the majority view of the *Detrich* en banc panel, as recognized by the court in *Clabourne*, 745 F.3d at 376-77, both the cause and prejudice prongs must be demonstrated in order to excuse procedural default under *Martinez.* Because the court finds that there was no "cause" for excusing the procedural default, however, it is not

necessary to proceed to determine whether Rodriguez has established the "prejudice" requirement under *Martinez.*

**CONCLUSION**

For the reasons set forth above, the court DENIES petitioner's *Martinez* motion to excuse the procedural default of the claim of ineffective assistance of trial counsel based on failure to investigate and present testimony by Jackson and Alberty. The remanded claim for habeas relief is therefore DISMISSED as procedurally barred, for the reasons set forth in the August 23, 2011 Order. The clerk shall close the file.

**CERTIFICATE OF APPEALABILITY**

The federal rules governing habeas cases brought by state prisoners require a district court that enters a final order adverse to the petitioner to grant or deny a certificate of appealability in the order. *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.

A petitioner may not appeal a final order in a federal habeas corpus proceeding without first obtaining a certificate of appealability. See 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b). Section 2253(c)(1) applies to an appeal of a final order entered on a procedural question antecedent to the merits. *See Slack v. McDaniel*, 529 U.S. 473, 483 (2000).

"Determining whether a COA should issue where the petition was dismissed on procedural grounds has two components, one directed at the underlying constitutional claims and one directed at the district court's procedural holding." *Id*. at 484-85. "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id*. at 484. As each of these components is a "threshold inquiry," the federal court "may find that it can dispose of the application in a fair and prompt manner if it proceeds first to resolve the

issue whose answer is more apparent from the record and arguments." *Id*. at 485. Supreme Court jurisprudence "allows and encourages" federal courts to first resolve the procedural issue, as was done here. *See id.*

Section 2253(c)(3) requires a court granting a COA to indicate which issues satisfy the COA standard. Here, the court finds that the issues whether the underlying ineffective assistance of counsel claim was substantial and the procedural question whether Rodriguez has established cause under *Martinez* to excuse the procedural default meet the above standard and accordingly GRANTS the COA as to those issues. *See Miller-El*, 537 U.S. at 338.

Accordingly, the clerk shall forward the file, including a copy of this order, to the Court of Appeals. *See* Fed. R. App. P. 22(b); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).

**IT IS SO ORDERED.**

Dated: March 25, 2015

PHYLLIS J. HAMILTON
United States District Judge